[No. A055691. First Dist., Div. Four. Dec. 21, 1992.]

AETNA LIFE INSURANCE COMPANY, Plaintiff and Appellant, v. STATE BOARD OF EQUALIZATION, Defendant and Respondent.

COUNSEL

McCutchen, Doyle, Brown & Enersen, John B. Lowry and David M. Heilbron for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Timothy G. Laddish, Assistant Attorney General, Richard F. Finn and Jack Newman, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**REARDON, J.**—Appellant Aetna Life Insurance Company (Aetna) paid $18.4 million in disputed taxes and sued to recover this sum, plus interest. The trial court entered judgment for respondent State Board of Equalization (the Board), from which Aetna appeals, contending that it was unlawfully taxed on premiums it never received.

### I. FACTS

Aetna is a Connecticut corporation doing business in California. In the tax years 1980 through 1984, it paid $18.4 million in taxes, plus interest, on its "Split Funded Group Plan" (SFGP), which is a group health care plan. Under

this plan, employee health care claims are paid from employers' funds up to a set liability limit or trigger-point, beyond which Aetna becomes liable for payment of claims. While some insurers set the trigger-point at 100 percent of the actuarially expected level of claims, Aetna's trigger-point was higher—from 107 percent to 115 percent of the expected level of claims. The employers—not Aetna—controlled the funds from which claims up to the trigger-point were paid. Aetna was responsible for all claims above the trigger-point.

The plan descriptions explained that Aetna was not obligated to pay claims up to the trigger-point even if the employers failed to pay them and that an employer's failure to pay such claims would not result in automatic termination of a plan or conversion to a standard group health insurance plan. The descriptions stated that the plans were underwritten by Aetna.

The Board assessed Aetna for taxes on claims paid by employers under this plan, asserting that they were taxable as gross premiums received by Aetna. (See Cal. Const., art. XIII, § 28.) Aetna petitioned the Board for redeterminations of the disputed taxes and interest which it contended were not legally owed to the state. The petitions were rejected, and Aetna's claims for refund did not produce the desired result.

In 1990, Aetna filed a complaint against the Board seeking a refund of $32.2 million in taxes and interest. After a court trial, the trial court ruled that the employers' payment of claims up to the liability limit or trigger-point did not make the employers insurers for premium tax purposes; Aetna is still the insurer. It issued a statement of decision finding that *Metropolitan Life Ins. Co.* v. *State Bd. of Equalization* (1982) 32 Cal.3d 649 [186 Cal.Rptr. 578, 652 P.2d 426] (hereafter *Metropolitan*) controlled the case and entered judgment in favor of the Board.[1]

## II. Discussion

Under article XIII, section 28 of the California Constitution, a franchise tax is imposed on each insurer doing business in this state which is measured by the amount of "gross premiums" that are "received" in a particular year. (See also Rev. & Tax. Code, §§ 12201, 12221.) Aetna does not contest the taxes imposed and paid on "gross premiums" that it has formally "received" from employers under the SFPG. Those premiums are paid directly to Aetna

---

[1]The complaint contained seven causes of action, one of which was based on allegedly erroneous calculations by the Board. The parties stipulated that this cause of action should be resolved in Aetna's favor and a separate judgment rendered on it. The judgment that is the subject of this appeal was one in favor of the Board on the remaining causes of action.

by the employer to cover all employee claims above the trigger-point. Aetna maintains that these sums are the only "gross premiums" that it has "received" and that the imposition of a tax on health benefits paid by employers to employees for claims below the trigger-point are simply not "gross premiums" that are "received" within the meaning of article XIII, section 28.

In terms of insurance risk and economics, Aetna's position has a certain appeal. Unlike a conventional group plan where the insurer assumes the entire risk and receives a premium for that undertaking, the SFGP places or leaves that risk with the employer up to the liability limit, which is fixed at from 107 percent to 115 percent of expected benefit claims. The setting of the liability limit at this high percentage results in the employer paying all claims in most years while providing insurance to the employer against extraordinary losses that may occur above the liability limit in an exceptional year. It was established at trial that the effect of setting the liability limit at the specified rate was that the employer paid approximately 99 percent of all benefits and Aetna approximately 1 percent. Because Aetna's obligation to pay claims was substantially reduced from that involved in a conventional plan, the premium charged and received by Aetna was accordingly reduced to reflect only its undertaking to pay claims above the liability limit and its services in administering this plan. Again, Aetna does not challenge the tax imposed on the SFGP premium that it receives, but rather the tax imposed based upon the amount of benefits paid by the employer to its employees on claims below the liability limit or trigger-point.

In *Metropolitan*, our Supreme Court was confronted with a similar tax challenge involving the "Mini-Met" plan, which was a health insurance plan that contained a liability limit or trigger-point that shifted 90 percent of the risk or obligation to pay benefits to the customer or employer. In discussing a risk analysis argument similar to that presented here, the court stated: "The presence or absence of insurance risk on the part of the employers is not alone determinative of Metropolitan's tax liability. A more illuminating inquiry is whether the purpose of the taxing provisions can best be fulfilled by including amounts paid on pretrigger-point claims within the gross premiums measure of Metropolitan's tax. To myopically focus on the employers' status diverts attention from this central issue. In attempting to fulfill the purpose of the gross premiums tax, it is preferable to look beyond the formal labels the parties have affixed to their transactions and seek, rather, to discern the true economic substance of the Mini-Met arrangement. We thus consider the insurance arrangement as a whole." (32 Cal.3d at pp. 656-657.) In considering the Mini-Met "insurance arrangement as a whole," the court upheld a tax on "the pretrigger-point claims paid from employer funds in the tax years in question." (*Id.*, at p. 662.)

Since the *Metropolitan* court has determined that the "presence or absence of insurance risk" is not alone determinative of tax liability (32 Cal.3d at p. 656), Aetna's arguments to the contrary must be directed to that court, not this one (see *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937]). In light of *Metropolitan*, we view our role as a limited one: to determine, under guidelines set forth in *Metropolitan*, whether the challenged tax was properly imposed.

As we read *Metropolitan*, the court, in considering "the insurance arrangement as a whole," found that "the obligations of Metropolitan [insurer] were inextricably intertwined with those of the employers." (32 Cal.3d at p. 657.) Based upon this finding or premise, the court concluded that the employer was "a mere agent of Metropolitan for collection of premiums, not an independent insurer" and that the entire cost of the Mini-Met plan was attributable to Metropolitan's gross premiums. (*Id.*, at p. 652.) Our task, then, is to determine whether the obligations of Aetna with respect to its SFGP are "inextricably intertwined" with those of its employers.

The finding of inextricable intertwining with respect to the Mini-Met plan was based upon several factors. First, if an employer failed to make funds available for payment of pre-trigger-point claims in any month, Metropolitan "remained obligated to cover the unpaid claims, subject to reimbursement from the delinquent employer." (*Metropolitan, supra,* 32 Cal.3d at p. 657, fn. omitted.) Second, if the employer failed to make funds available, the Mini-Met plan would automatically terminate and standard coverage "would revert into effect at the end of the month in question." (*Ibid.*) Third, if a reversion occurred, the employer would then be liable for a termination premium, which was calculated as the total premiums the employer would have paid for standard coverage during the policy year, less the Mini-Met premiums paid and any claims paid from employer funds in that year. Fourth, the employer had a fixed limit on the amount of funds that it was obligated to make available in each month, a limit corresponding to the expected level of claims which, if exceeded, was a risk carried by Metropolitan. Based upon these factors, the court found there to be a "highly entangled, symbiotic relationship between the employers and Metropolitan" such that the employers were not really acting as separate insurers for payment of the pre-trigger-point claims. (*Id.*, at p. 658.)

In contrast to the Mini-Met plan, the SFGP contains only one of the factors that the *Metropolitan* court relied upon to support the conclusion that the obligations of the insurer were "inextricably intertwined" with those of the employers. Under the SFGP, Aetna is not obligated to pay pre-trigger-point claims if the employer fails to do so. That obligation to pay remains

exclusively and entirely with the employer. Second, there is no automatic reverting to the standard coverage if the employer fails to pay a pre-trigger-point claim. The employer, therefore, cannot control or alter the coverage under the SFGP by simply failing to make a pre-trigger-point claim payment. Third, because there is no reversion to standard coverage under the SFGP, no conventional premium is ever owed or paid by the employer. Only the fourth factor, i.e., the employer's fixed limit on the amount of funds obligated to be made available each month, is common to both Mini-Met and the SFGP.

We agree with *Metropolitan* that the foregoing factors are important in assessing the true relationship between the insurer and the employer and in determining the actual nature of the policy. Since only one of the four relevant factors is present here, we must conclude, under the *Metropolitan* analysis, that the obligations of the insurer and employer in Aetna's SFGP are not "inextricably intertwined" and that the employer is not acting as "mere agent" of Aetna for collection of premiums.

Having determined that the obligations of Aetna and the employer are not "inextricably intertwined," we examine the "insurance arrangement as a whole" to discern the "true economic substance" of the SFGP.

Aetna is obligated to pay all claims above the liability limit. It maintains a reserve to cover those claims. It receives a premium from the employers for undertaking this obligation; it pays taxes on the premium received; it does not contest imposition of a tax on the premium received. The employer is obligated to pay all claims up to the liability limit. That obligation remains entirely and exclusively with the employer. The employer maintains a fund from which to pay claims up to the liability limit. The economic advantage that the SFGP provides the employer is twofold: (1) substantially reduced premiums; and (2) retention of the "float," i.e., the opportunity to use the funds maintained until disbursed to satisfy claims. The economic disadvantage that the SFGP causes the insurer is also twofold: (1) it receives substantially reduced premiums; and (2) it no longer retains the significant "float" that would be available under standard coverage. According to Aetna, over $13 billion was paid by employers on claims under the SFGP during the tax years in issue. This $13 billion was never received, kept, used or enjoyed by Aetna as gross premiums or "float." Yet this is the amount upon which the instant tax is imposed.

The "true economic substance" of the SFGP is: that the employer bears the bulk of the insurance risk in acting as an independent insurer for all

claims below the liability limit; that the employer in performing its independent obligations under the SFGP is not acting as "a mere agent" of Aetna for the collection of premiums; and that the obligations of Aetna under the SFGP are not "inextricably intertwined" with those of the employers.

Accordingly, we conclude, under *Metropolitan*, that the cost of claims paid by the employers under the SFGP is not taxable as gross premiums received by and "inuring to the benefit of" Aetna. (32 Cal.3d at p. 662.) Aetna is, therefore, entitled to a refund.

### III.  CONCLUSION

The judgment is reversed.

Poché, Acting P. J., and Perley, J., concurred.

A petition for a rehearing was denied January 8, 1993, and respondent's petition for review by the Supreme Court was denied March 25, 1993. Lucas, C. J., and Mosk, J., were of the opinion that the petition should be granted.