[No. C014000. Third Dist. Dec. 27, 1993.]

PRUDENTIAL INSURANCE COMPANY OF AMERICA et al., Plaintiffs and Respondents, v.
STATE BOARD OF EQUALIZATION, Defendant and Appellant.

**COUNSEL**

Daniel E. Lungren, Attorney General, Lawrence K. Keethe and Robert D. Milam, Deputy Attorneys General, for Defendant and Appellant.

Pillsbury, Madison & Sutro, Walter R. Allan, Stephen J. Martin and Thomas V. Loran III for Plaintiffs and Respondents.

**OPINION**

**SIMS, J.**—This case involves liability for a tax mandated by article XIII, section 28 of the California Constitution. That provision imposes a tax on insurers, other than title insurers, doing business in this state. As pertinent, the constitutional provision provides: "[T]he 'basis of the annual tax' is, in respect to each year, the amount of gross premiums, less return premiums, received in such year by such insurer upon its business done in this State . . . ." (*Id.* subd. (c).)

Defendant, State Board of Equalization (SBE), appeals from a trial court judgment in favor of plaintiffs, Prudential Insurance Company of America

and Pruco Life Insurance Company (collectively Prudential), in Prudential's action for a refund of certain "gross premiums" insurance taxes paid by Prudential on group health insurance contracts under which employers assumed the obligation to pay their employees' health care claims up to an annual "trigger-point" amount and Prudential assumed the obligation to pay claims above that amount. The taxes at issue in this appeal were assessed against Prudential for that aspect of the contracts dealing with claims below the trigger-point, i.e., claims which were the obligation of the employers rather than Prudential. Since Prudential received no premiums for the below-trigger-point aspect of the contracts, the taxing authorities measured Prudential's "gross premiums" tax liability on that aspect of the contracts by the amount of claims paid by the employers to their employees' health care providers. On appeal, SBE contends that in funding below-trigger-point claims the employers were acting as Prudential's agents, and the claims paid by the employers were an aspect of Prudential's insurance business for which Prudential incurs tax liability.

We disagree with SBE and therefore shall affirm the judgment.

### Factual and Procedural Background

During the tax years in question—1968 through 1976 and 1979 through 1986—Prudential provided a type of group health insurance coverage which it called "Minimum Premium Plan" (MPP) contracts. During that time, they had 321 MPP contracts. Unlike a standard or conventional policy where the employees are fully insured by the insurance company, the MPP contract (a group policy with an MPP rider) called for the employer to fund its employees' health care claims up to an annual maximum or "trigger-point" amount agreed upon by the employer and Prudential. Prudential funded claims over the annual trigger-point.

The trigger-point was set by taking the actuarially expected amount of employee health care claims and adding a margin of 5 to 15 percent (thereby shifting an insurance risk to the employer). The size of the margin depended on the number of employees; the margin was larger for smaller groups, where the risk of claims fluctuation was greater.

The record contains a sample MPP rider, which provides in part as follows:

"The Group Policy is modified, as provided in the following sections, due to the establishment by the Policyholder of one or more employee benefit

plans (herein called the Employee Benefit Plan)[1] under which benefits similar to certain coverages of the Group Policy are provided for certain Employees. Benefits for those Employees under those coverages of the Group Policy will become payable only after benefits payable by the Policyholder under the Employee Benefit Plan reach an aggregate limit."

The MPP rider also provides: "While this Rider remains in effect, Prudential shall have the obligation during each policy year to pay benefits under the coverages with respect to claims for benefits becoming due during such year only after the Policyholder Yearly Maximum is reached during such year, determined as provided below. . . .

". . . The Policyholder Yearly Maximum shall, for the purposes of this Rider, be deemed to be reached during a policy year when the total aggregate Benefit Formula amounts for benefits becoming due during that policy year equals the applicable amount of the Policyholder Yearly Maximum for such policy year as specified below."

The MPP rider further provides: "In no case shall Prudential be liable for the payments of benefits in excess of those payable under the Group Policy pursuant to this Rider, nor shall the Policyholder be liable for any benefits payable by Prudential under the Group Policy pursuant to this Rider, it being understood and agreed that *the obligations of the Policyholder under the Employee Benefit Plan and of Prudential under the Group Policy pursuant to this Rider are and shall be mutually exclusive.*" (Italics added.)

Although employer funds were used to pay employee health care claims below the trigger-point, Prudential administered those claims on most of its MPP contracts—by processing claims and determining what benefits would be payable. Prudential also defended suits in the event of an employee's challenge to denial of any claim, though the employer was liable for any below-trigger-point benefit payment included in any judgment or settlement. Thus, the MPP rider provided: "Prudential shall make final determination of the amount of benefits, if any, for which an Employee qualifies under the Benefit Formula, and benefits payable under the Employee Benefit Plan will

---

[1]SBE points out the record does not contain any example of an employer-established employee benefit plan. Prudential asserts this in incorrect but does not direct our attention to any employer-established plan in the record. Instead, Prudential cites a 267-page span of the record consisting of Prudential documents that comprise the University of California MPP contract, i.e., group insurance policy and MPP rider. Nevertheless, SBE does not contend that the employers never set up separate employer plans or that evidence of the employer plans was required in order for Prudential to prevail. SBE asserts only that the employer plans were "relevant to the insurance."

be based on such determination. If Prudential so determines that any claim does not qualify for benefits under the Benefit Formula and if any suit is brought with respect to such claim, Prudential agrees to undertake at its expense the defense of such suit, and Prudential shall have the right to settle any such suit when in its judg[ ]ment it appears expedient to do so. The Policyholder hereby agrees to pay the amount of benefit payment included in any judg[ ]ment or settlement which is not an obligation of Prudential hereunder." For those contracts which were administered by the employer rather than Prudential, Prudential retained the right to audit claims.

Employers holding MPP contracts set aside their own reserves to fund below-trigger-point claims. Originally, the method of handling claims was that the employers gave Prudential a quantity of the employer's check stock on which Prudential printed the checks to pay claims below the trigger-point. Thus, under that system (called "imprest" accounts), the checks were drawn directly on the employer's account. Because of the administrative difficulty in handling check stocks for hundreds of different employers, in 1979-1980 Prudential changed to a "Prumark Account," which was a custodian account run by the bank. Prudential had the number of the employers' bank accounts and would notify the custodian bank of Prudential's issuance of checks to pay claims on each employer's account. The custodian bank, with prior authorization from the employers, would then transfer funds by wire from the employer's account to cover the checks issued. Once the trigger-point was reached, Prudential transferred its own funds into the Prumark Account.

The record contains a sample information booklet or plan summary given to employees (of the University of California),[2] which informed them: "The Prudential Insurance Company administers the Health Care Plan and all benefit payments are based on Prudential's determination. *The University pays for Plan liabilities directly up to an annual maximum determined by a formula in the Prudential Group Policy. If the maximum is reached, liabilities are paid by the Group Policy. This is the only liability assumed by Prudential for the benefits of the Plan.*" (Italics added.) Attached to the employee booklet was a certificate of group coverage, which stated in part: "The Group Policy has been modified with respect to the coverages indicated above to take into account the Policyholder's establishment of a plan of benefits, herein called 'the Employer's Plan.' *To the extent that the benefits under such coverages are afforded under the Employer's plan, they are the liability of the Employer and not Prudential.* The Group Policy, as modified, specifies the time when and the circumstances under which Prudential is liable for such benefits." (Italics added.)

---

[2]The record apparently contains only one such booklet, for the University of California. However, the parties appear to agree that other MPP contract holders had similar booklets.

Most of Prudential's MPP contracts were "Post-Discontinuance Maximum" (PDM) contracts. In the event of termination of a PDM/MPP contract, Prudential had no obligation to provide conventional group insurance and had no obligation to pay below-trigger-point claims during the "run-off period," i.e., the posttermination period during which "incurred but not reported" (IBNR) claims continued to be presented for payment. PDM/MPP contracts limited Prudential's liability for IBNR claims to amounts over a set "Post-Discontinuance Maximum" amount, which was set high enough that it would not be exceeded. Thus, no premium was charged for the run-off period and no reserves were set aside. Prudential's witnesses testified the PDM maximum had never been exceeded. PDM contracts account for 90 percent of the taxes here at issue. Upon termination of non-PDM/MPP contracts, there was in effect a reversion to conventional group insurance during the run-off period only, with Prudential liable for payment of IBNR claims. Other than the termination feature, there were no material differences between PDM and non-PDM contracts.

Premiums for an MPP contract were substantially less (approximately 90 percent) than premiums for a standard policy. The MPP premium was calculated by taking the premium for a conventional policy and subtracting expenses that Prudential would not incur under the MPP contract, such as "risk charges,"[3] the amount of actuarially expected claims, and the gross premiums tax that would have been paid to the state on the premium for a standard policy. The resulting amount became the base for the MPP premium. To that number, Prudential added certain charges (including profit and gross premiums tax payable to the state on the MPP premium) in order to arrive at the MPP premium.

Prudential created the MPP contract for business reasons: (1) larger employers wanted to become self-insured in order to obtain the benefits of increased cash flow and interest earnings on funds that otherwise would have been paid out as premiums under a conventional group policy, and (2) Prudential wanted to remain competitive with other insurance companies which were providing similar plans.

For the tax years in question, Prudential declared and paid "gross premiums" tax on the MPP premiums it received. Prudential does not seek a refund of those taxes, and they are not at issue in this proceeding.

---

[3]"Risk charges" reflect the risk factor built into the standard premium, i.e., the risk that Prudential would lose money, for which it charged each standard policyholder an amount to cover the risk Prudential was taking under the standard policy.

The Department of Insurance determined and SBE assessed a "gross premiums" tax deficiency (Cal. Const., art. XIII, § 28 [fn. 7, *post*]; Rev. & Tax. Code, § 12221 [fn. 8, *post*][4]), taking the position that the aspect of MPP contracts below the trigger-point was part of Prudential's insurance business, for which Prudential incurred tax liability. Since Prudential received no premiums for that aspect of the contracts, SBE measured constructive "gross premiums" by the amounts paid by MPP employers to health care providers for their employees' health care claims.

Prudential paid the deficiency assessments and filed administrative claims for refund, which were denied by SBE. (§ 12978.) Prudential then filed this action for refund under section 13102.

A court trial was held in October 1991. In March 1992, the trial court issued its statement of decision, finding in favor of Prudential. The trial court stated its decision turned on the applicability of *Metropolitan Life Ins. Co. v. State Bd. of Equalization* (1982) 32 Cal.3d 649 [186 Cal.Rptr. 578, 652 P.2d 426]. There, the Supreme Court decided that Metropolitan's "Mini-Met" insurance plan, under which employers paid up to the actuarially expected level of claims and the insurance company paid for claims above that level, was in reality, as far as the insured employees were concerned, one insurance relationship, and that taxable gross premiums should be measured by the cost of the insurance, i.e., by the claims paid by the employer plus the premium paid to the insurance company.

Here, the trial court found Prudential's MPP contracts were distinguishable from the Mini-Met plans in that Prudential was not primarily or secondarily liable for claims below the trigger-point, and the trigger-point was set at a margin significantly above the actuarially expected level of claims, such that the employers assumed an insurance risk under the MPP contracts and Prudential provided excess insurance coverage only. The trial court thus determined MPP contracts were similar to nontaxable "administrative services only" (ASO) plans, with "stop loss" policies.[5]

The trial court further stated its decision was based "in significant part" on the evidence adduced at trial that under the MPP contracts, Prudential's

---

[4]Undesignated statutory references are to the Revenue and Taxation Code.

[5]An administrative services only (ASO) contract is an agreement whereby the employer provides health insurance to its employees and is directly liable to its employees for all claims but contracts with an insurance company to administer the plan by processing claims and providing financial and actuarial advice. ASO contracts are commonly issued in conjunction with a stop-loss insurance policy, whereby the employer remains liable to employees for all claims but, over an agreed-upon amount, the employer can recover from the insurance

profit decreased by approximately 70 percent, because a large portion of their profit derived from interest earned on the claim reserve which, under the MPP contracts, was no longer available to Prudential.

The trial court concluded: "Because Prudential did not continue to [ ]derive substantially the same benefit of doing business in California under the MPP Contracts and because the Court finds that these programs were not designed as tax avoidance schemes but rather were economically and competitively motivated, the Court finds the *Metropolitan* [ ] decision to be inapplicable and holds for plaintiff. . . ."

The trial court accordingly entered judgment in favor of Prudential for a full refund of the contested taxes, amounting to more than $30 million, plus interest.

## DISCUSSION

### I.  *Standard of Review*

The parties agree that this appeal presents only legal issues subject to this court's independent review, because resolution turns on the interpretation of written instruments and undisputed facts.[6] (*Metropolitan Life Ins. Co. v. State Bd. of Equalization, supra,* 32 Cal.3d at p. 658; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].)

---

company. Thus, ASO with stop-loss is a self-insured employer plan with excess insurance coverage provided by the insurance company. Under an ASO/stop-loss arrangement, the employer is liable for the employees' claims without regard to whether the insurer ever pays the employer. The ASO portion is not a contract of insurance. The stop-loss is a contract of insurance, in which the employer rather than the employee is the insured.

In this case, the parties agree that an ASO/stop-loss arrangement is subject to "gross premiums" insurance taxation only as to the premium paid to the insurance company by the employer for the stop-loss insurance policy. SBE agrees it does not assess a gross premiums tax against insurance companies for ASO contracts.

Prudential created the MPP contract rather than use an ASO/stop-loss arrangement due to some initial doubt as to whether the law at that time (1960's) in Prudential's chartering state (New Jersey) would allow an insurance company to engage in an ASO business, providing administrative services without insurance. The New Jersey Insurance Commissioner subsequently approved that type of service. Since then, most of Prudential's MPP clients have shifted to the ASO/stop-loss arrangement.

[6]Prudential agrees to a de novo standard of review, though it notes that there was conflicting opinion evidence on the issue of where MPP contracts fell along the insurance continuum, with standard policies at one end and ASO/stop-loss at the other end.

## II. *Taxation of the Business of Insurance*

Insurance companies doing business in this state are liable for insurance taxes based on "gross premiums" that are "received" by the insurer. (Cal. Const., art. XIII, § 28 (hereafter art. XIII, § 28[7]); § 12221.[8])

Our Supreme Court has explained: "The purpose of the taxing provisions [ ] is [ ] to exact payments from insurers doing business in California; the gross premiums measure is apparently designed to approximate the volume of business done in this state, and thus the extent to which insurers have availed themselves of the privilege of doing business in California." (*Metropolitan, supra*, 32 Cal.3d at p. 656.)

## III. *Taxation Of MPP Contracts*

The parties agree that the result in this case turns on applicability of the California Supreme Court's decision in *Metropolitan, supra*, 32 Cal.3d 649. SBE contends the MPP contracts at issue here are indistinguishable in any material respect from the insurance contracts at issue in *Metropolitan*, compelling the conclusion that SBE properly assessed a tax on Prudential for the below-trigger-point aspect of the MPP contracts. Prudential contends its MPP contracts differ in material respects from the contracts at issue in *Metropolitan*.

*Metropolitan* involved group health insurance arrangements called the "Mini-Met plan," whereby the employer assumed the obligation of employee health care claims below a monthly trigger-point amount and the insurance company assumed the obligation for claims above the trigger-point. The Supreme Court held that under the Mini-Met arrangement the employer was a mere agent of the insurance company, not an independent insurer, and therefore the entire cost of the group plan was taxable to the insurance company.

---

[7]Article XIII, section 28, provides in part: "(b) An annual tax is hereby imposed on each insurer doing business in this State on the base, at the rates, and subject to the deductions from the tax hereinafter specified. [¶] (c) In the case of an insurer not transacting title insurance in this State, *the 'basis of the annual tax' is, in respect to each year, the amount of gross premiums, less return premiums, received in such year by such insurer upon its business done in this State*, other than premiums received for reinsurance and for ocean marine insurance. . . . [¶] (j) This section is not intended to and does not change the law as it has previously existed with respect to the meaning of the words 'gross premiums, less return premiums, received' as used in this article." (Italics added.)

[8]Section 12221 provides in part: "In the case of an insurer not transacting title insurance in this State, the basis of the tax is, in respect to each year, the amount of gross premiums, less return premiums, received in such year by such insurer upon its business done in this State. . . ."

The Supreme Court explained the background of the dispute as follows:

"Before 1967, when it began offering the 'Mini-Met' plan which is the subject of the instant controversy, Metropolitan offered employers a plan denominated the standard group policy. According to the terms of such policies, the employers paid a premium in return for Metropolitan's assumption of the entire obligation to provide health coverage to benefited employees. The premiums for the standard policies represented the entire cost of the agreed-upon coverage, and Metropolitan paid a tax calculated as a percentage of the total premiums it received.

"The arrangements here at issue represent an alteration of Metropolitan's standard group policies. Under the standard plans, Metropolitan retained the benefit of the 'float'—the use of premium funds from the time of payment until the funds were disbursed to satisfy claims. In addition, Metropolitan apparently passed through to the employers, as an element of premiums, the amount of its premiums tax liability. Motivated by a desire to reduce the cost of insurance coverage and to obtain an improved cash-flow situation, the employers persuaded Metropolitan to modify its group insurance coverage. Metropolitan obliged by developing the Mini-Met rider to the standard group policy.The rider shifted certain cash-flow advantages to the employers and sought to substantially reduce Metropolitan's premiums tax liability.

"The Mini-Met rider required employers to assume the obligation to pay all employee claims for benefits up to a 'trigger-point' amount, defined as the actuarially predicted, monthly average level of aggregate employee claims. Metropolitan remained obligated to pay all claims in excess of that amount. Because Metropolitan was primarily obligated to pay employee claims only after the trigger point was reached for a particular month, it charged the employers a premium reduced by 90 percent. Hence, rather than paying a single premium to Metropolitan as they had previously done, the employers who elected to adopt the Mini-Met rider paid pretrigger-point claims directly to the employees and paid the smaller premium to Metropolitan." (*Metropolitan, supra,* 32 Cal.3d at pp. 652-653.)

For each tax year at issue, the taxing authorities assessed a gross premiums tax on Metropolitan based upon the sum of the premiums actually received by Metropolitan plus the amount paid by employers for employee health care claims. (*Metropolitan, supra,* 32 Cal.3d at p. 653.) Metropolitan paid the tax and sought a refund.

The Supreme Court began by defining insurance: "The Legislature has defined insurance as 'a contract whereby one undertakes to indemnify

another against loss, damage, or liability arising from a contingent or unknown event.' (Ins. Code, § 22.) Thus, insurance necessarily involves two elements: (1) risk of loss to which one party is subject and a shifting of that risk to another party; and (2) distribution of risk among similarly situated persons. [Citations.]

"That the employees are the insureds under employer-provided group health insurance plans cannot seriously be disputed. We plainly stated in *Elfstrom* v. *New York Life Ins. Co.* (1967) 67 Cal.2d 503, 514, footnote 9 [ ], that 'the employee, in the tri-partite group insurance situation is the real insured under the policy.' More generally, Insurance Code section 23 provides that 'the person indemnified is the insured.' Employee health plans cover the risk of injury or disability of the employees; the employees receive indemnification when such losses occur. That the employer may be the nominal policyholder is not significant; the employees remain those against whose potential loss the insurer provides indemnification." (*Metropolitan, supra,* 32 Cal.3d at p. 654.)

Metropolitan argued that the employees were the insureds of Metropolitan only to the limited extent of its "excessive risk" coverage and that the employers were separate insurers as to all employee claims aggregating less than the trigger-point amount. (*Metropolitan, supra,* 32 Cal.3d at pp. 654-655.) SBE argued Metropolitan was the sole insurer under the Mini-Met plan, bearing the entire insurance risk. (*Ibid.*)

The Supreme Court noted the purpose of the taxing provisions was not to protect insureds but to exact payments from insurers for the privilege of doing business in California. (*Metropolitan, supra,* 32 Cal.3d at p. 656.) "The presence or absence of insurance risk on the part of the employers is not alone determinative of Metropolitan's tax liability. A more illuminating inquiry is whether the purpose of the taxing provisions can best be fulfilled by including amounts paid on pretrigger-point claims within the gross premiums measure of Metropolitan's tax. To myopically focus on the employers' status diverts attention from this central issue. In attempting to fulfill the purpose of the gross premiums tax, it is preferable to look beyond the formal labels the parties have affixed to their transactions and seek, rather, to discern the true economic substance of the Mini-Met arrangement. We thus consider the insurance arrangement as a whole." (*Metropolitan, supra,* 32 Cal.3d at pp. 656-657.)

The Supreme Court determined that under the Mini-Met arrangement employers functioned not as independent insurers but as "mere agents or

distributors of funds."(*Metropolitan, supra,* 32 Cal.3d at p. 657.) "Under the Mini-Met arrangement, Metropolitan retained control over many aspects of the administration of the total plan. Metropolitan determined the amount of all benefits to be paid in satisfaction of employee claims, both above and below the trigger-point, with the obligation to defend and the right to settle suits contesting rejection of claims. As to 13 of the 15 employers covered by the Mini-Met package, Metropolitan actually paid claims from the special accounts of the employers pursuant to authorization by the employers. Rather than paying the cost of group insurance directly to Metropolitan, these employers deposited the money into accounts under Metropolitan's control. The payments to employees from such accounts constituted an element of overall cost of the insurance package in the same manner as if those amounts had been paid to Metropolitan as 'premiums' then forwarded to the employees by Metropolitan in satisfaction of the employee claims. For the purpose of calculating the gross premiums tax, we can discover no reasoned basis for distinguishing between the situation here presented and the former arrangement between Metropolitan and the employers. Metropolitan continued to derive substantially the same benefit of doing business in California and should logically have continued to incur the same tax liability.

"True, the employers were primarily liable for payment of pretrigger-point claims. However, the obligations of Metropolitan were inextricably intertwined with those of the employers. If an employer failed to make funds available for payment of pretrigger-point claims in any month, Metropolitan remained obligated to cover the unpaid claims, subject to reimbursement from the delinquent employer. [Fn. omitted.] The Mini-Met arrangement would then automatically terminate and the standard Metropolitan coverage would revert into effect at the end of the month in question. The employer would then be liable to Metropolitan for a termination premium, equal to the total premiums which would have been payable to Metropolitan from the employer in the current policy year had the standard group policies remained in effect, less the sum of the Mini-Met premiums paid to Metropolitan in that year plus the claims actually paid to employees from employer funds in that year.

"Furthermore, the employers had a fixed limit on the amount of funds they were obligated to make available in each month, a limit corresponding to the expected level of claims. Metropolitan thus bore the substantial insurance risk under the Mini-Met arrangement—the risk that the actual level of claims for a given month might exceed the predicted level. Given this highly entangled, symbiotic relationship between the employers and Metropolitan,

it is hard to accept Metropolitan's contention that in providing funds for payment of pretrigger-point claims, the employers were discharging their independent liabilities as separate insurers. [Fn. omitted.]" (*Metropolitan, supra*, 32 Cal.3d at pp. 657-658.)

The Supreme Court concluded: "An examination of the facts of this case leads us to the conclusion that the employers in this case [ ] acted as mere agents of an insurer. The function of the employers under the Mini-Met arrangement was extremely limited; 13 out of 15 employers did no more than to establish and fund, on a continuing basis, bank accounts out of which Metropolitan, by special authorization, disbursed benefit payments for employee claims aggregating less than the trigger-point amount in a particular month. The remaining two employers paid out benefits without the assistance of Metropolitan. Surely these activities fall within the ambit of 'administration' of a group insurance policy and constitute doing business in California. Thus, the employers are to be treated as agents of Metropolitan, as a matter of law." (*Metropolitan, supra*, 32 Cal.3d at p. 659.)

Having concluded "there was but one insurer" under the Mini-Met plan, the Supreme Court turned to the question of how to measure Metropolitan's insurance business on that aspect of the contracts below the trigger-point, since no "premiums" were received by Metropolitan for that aspect of the contracts.[9] (*Metropolitan, supra*, 32 Cal.3d at p. 659.) As will appear, we have no need to reach that question, because we will conclude that under the MPP plans, Prudential was not the insurer for claims below the trigger-point.

The First District recently construed *Metropolitan* in *Aetna Life Ins. Co.* v. *State Bd. of Equalization* (1992) 11 Cal.App.4th 1207 [15 Cal.Rptr.2d 26] (review den.). In *Aetna*, the insurance company sought a refund of gross premiums tax assessed on a "split funded group plan," under which employers paid health care claims up to a trigger-point and Aetna paid claims over

---

[9]*Metropolitan* said the gross premiums tax is based on the total cost of the insurance coverage provided to the insured. (32 Cal.3d at p. 660.) The gross premium ordinarily includes two elements—the net premium and the "loading." (*Ibid.*) The court said the net premium in a standard policy is the expected level of claims payments. (*Ibid.*) The loading is composed of miscellaneous charges, including the insurer's administrative costs, profit, and a charge for assuming the risk that claims outlays will exceed the expected level. (*Ibid.*) The court said that under the Mini-Met plan, the trigger-point amount was analogous to the net premium under a standard policy, and the premium actually paid to *Metropolitan* was analogous to the loading under a standard policy. (*Ibid.*) The below-trigger-point claims paid by employers were part of the total cost of insurance to the insured employees, because the health insurance coverage was part of the employees' compensation, for which employees paid with their labor. (*Id.* at p. 661.) Thus, claims paid by the employer to employees or their health care providers were a cost of the insurance to the insured employees, hence a component of gross premiums for taxation purposes. (*Ibid.*)

that point. The Court of Appeal held Aetna was not liable for gross premiums tax on that portion of the plan involving below-trigger-point claims. The court distinguished the Aetna plan from the plan at issue in *Metropolitan*, in that (1) Aetna was not obligated to pay below-trigger-point claims in the event of employer default; (2) there was no automatic reversion to standard coverage in the event of employer default; and (3) because there was no reversion to standard coverage, no conventional premium was ever owed or paid by the employer for that aspect of the plan. (*Aetna, supra,* 11 Cal.App.4th at pp. 1211-1212.) *Aetna* further noted that an insurance risk had been shifted to the employer because the trigger-point amount was set by adding a margin to the actuarially expected level of claims. (*Id.* at p. 1210.) The *Aetna* court concluded the employer was an independent insurer of below-trigger-point claims, such that Aetna incurred no tax liability for that aspect of the plan. (*Id.* at pp. 1212-1213.) As will appear, this case involves similar distinctions from the plan involved in *Metropolitan.*[10]

### A. *Prudential Was Not an Insurer of Below-trigger-point Claims*

■ The critical question under *Metropolitan* is whether Prudential or the employer was the insurer as to below-trigger-point claims. If the employer was the insurer, then Prudential is not liable for gross premiums tax on that aspect of the contracts. If the employer funded below-trigger-point claims as a mere agent of Prudential, then Prudential was the insurer and incurs tax liability.

SBE contends Prudential's MPP contracts were similar to the contracts at issue in *Metropolitan*, compelling the same result. We agree with Prudential, however, that several factors distinguish MPP contracts from the plans at issue in *Metropolitan* and lead to the conclusion that in paying below-trigger-point claims, employers under MPP contracts were not acting as mere agents of Prudential.

Thus, *Metropolitan* cited various factors leading to its conclusion that *Metropolitan* was the sole insurer: (1) the insurance company retained control over administration of the total plan; (2) the contract terms made the insurance company secondarily liable for below-trigger-point claims in the event of employer default; (3) in the event of employer default, the plan automatically terminated and reverted to a standard policy; and (4) because the trigger-point was fixed at the actuarially expected level of claims, the

---

[10]SBE argues *Aetna* "myopically" focused on the taxing provision's reference to gross premiums "received" and ignored *Metropolitan*'s mandate that "received" includes constructive receipt. We disagree. *Aetna* followed the analysis set forth in *Metropolitan.*

insurance company rather than the employer bore the insurance risk that claims would exceed the predicted level. (*Metropolitan, supra,* 32 Cal.3d at pp. 657-658.)

As will appear, only the first factor—claims administration by the insurance company—is present in this case. The other three factors are absent. Thus, in summary, the distinguishing features of MPP contracts are as follows: First, under the MPP contract terms, Prudential assumed no primary or secondary liability for payment of claims below the annual trigger-point. Second, in the event of employer default, MPP contracts did not automatically revert to a conventional policy. Third, the MPP trigger-point included a margin 5 to 15 percent above the actuarially expected level of claims, which shifted an insurance risk to the employer. We will discuss each feature in turn.[11]

### 1. Mutually Exclusive Liabilities

■ SBE contends Prudential bore secondary liability for below-trigger-point claims. We disagree.

We note Prudential cites its own trial testimony that in the event of a default by the employer, Prudential would not assume the obligation for below-trigger-point claims. We agree with SBE that Prudential's assertions of what it would do are not dispositive. Our concern is what Prudential was required to do by the terms of its agreement. Thus, we look to the contract provisions. We also note that SBE cites trial testimony that in one employer-bankruptcy case, the facts of which do not appear in this record, a bankruptcy court ordered Prudential to pay below-trigger-point claims for a bankrupt employer. SBE contends this evidence demonstrates Prudential was secondarily liable for below-trigger-point claims, and Prudential had the burden to produce evidence to dispel the adverse inference arising from this testimony. We disagree. We are not bound by the bankruptcy court decision. As we have explained, it is our task to construe the terms of the agreement.[12]

We turn to the contract provisions to resolve the question of liability. As indicated, the MPP rider contained various provisions limiting Prudential's liability: "Benefits [under] the Group Policy will become payable only after

---

[11]Prudential points out as a fourth distinguishing feature that MPP contracts set the trigger-point on an annual basis, unlike the monthly trigger-point in *Metropolitan*, which Prudential asserts made the Mini-Met plan budgetable and predictable and more like conventional insurance. We find the three above stated features sufficient to distinguish this case from *Metropolitan*.

[12]We note the testimony in this case also showed that in a different employer bankruptcy case, Prudential was held *not* liable for below-trigger-point claims. We also note Prudential

benefits payable by the Policyholder under the Employee Benefit Plan reach an aggregate limit"—"Prudential shall have the obligation [ ] to pay benefits [ ] only after the Policyholder Yearly Maximum is reached"—"In no case shall Prudential be liable for the payments of benefits in excess of those payable under the Group Policy pursuant to this Rider [ ], it being understood and agreed that the obligations of the Policyholder under the Employee Benefit Plan and of Prudential under the Group Policy pursuant to this Rider are and shall be mutually exclusive."[13]

Thus, the contract provisions do not place any primary or secondary liability on Prudential for below-trigger-point claims. SBE does not contend otherwise.[14] Instead, SBE argues the informational booklet given to employees places secondary liability on Prudential. SBE cites authority for the proposition that where terms of an insurance contract are inconsistent with a plan summary given to employees, the summary controls when it favors coverage for the employees, and ambiguities are resolved against the insurance company. (E.g., *Bass* v. *John Hancock Mut. Life Ins. Co.* (1974) 10 Cal.3d 792, 797 [112 Cal.Rptr. 195, 518 P.2d 1147]; *Humphrey* v. *Equitable Life Assur. Soc.* (1967) 67 Cal.2d 527, 532 [112 Cal.Rptr. 195, 518 P.2d 1147].)

However, SBE cites nothing in the plan summary given to employees that is inconsistent with the contract or ambiguous as to the absence of any liability on the part of Prudential for below-trigger-point claims.

SBE quotes the following statements in the plan summary given to employees:

(i)  "Your Prudential Health Care Plan."

(ii)  "The University pays for Plan liabilities directly up to an annual maximum determined by a formula in the Prudential Group Policy. If the

---

generally used MPP contracts for large employers who had the financial strength to accept the risk of self-insurance.

[13]Though not relied upon by SBE, we note that in this case it was contemplated that Prudential might pay some claims that were chargeable to the employer and would then have to seek reimbursement from the employer. Thus, the MPP rider states: "If Prudential pays any amount of benefits which is an obligation under the Employee Benefit Plan, the Policyholder shall reimburse Prudential for such payment." This provision, which allows for recovery of inadvertent payments by Prudential, does not require Prudential to pay employee claims in the event of employer default.

[14]In its reply brief, SBE points out that the MPP rider states the group policy is modified by the establishment of employer plans "under which benefits *similar* to certain coverages of the Group Policy are provided *for certain employees*." (Italics added.) SBE's sole contention regarding the italicized language is that it fails to state that employees will have a potential uninsured liability if the employer defaults. We do not believe such a statement was required in the MPP rider.

maximum is reached, liabilities are paid by the Group Policy. This is the only liability assumed by Prudential for the benefits of the Plan."

(iii)  "The University pays the entire cost of the Plan for you and your eligible dependents."

(iv)  Claims are reviewed by the insurance company and if denied the insurance company notifies the employee. Any appeal of denial is sent to "the Prudential claim manager."

(v)  For disability insurance, "[w]ritten proof of loss must be furnished to Prudential."

(vi)  The group policy plan constitutes the agreement under which payments are made.

(vii)  "The Group Policy, as modified, specifies the time when and the circumstances under which Prudential is liable for such benefits."

We find nothing in any of these statements that is inconsistent with the MPP contract or that creates any ambiguity or implies that Prudential will assume the employer's obligations in the event of employer default. The cited statements are consistent with the MPP contract's limitation of Prudential's liability.

SBE contends that the statement in paragraph (ii)—that the employer pays for liabilities directly up to an annual maximum—emphasizes only that liabilities are split according to a predetermined formula. We disagree with SBE's suggestion that this somehow makes Prudential secondarily liable for the employer's obligations.

SBE contends that the statement in paragraph (vii)—that the group policy specifies " 'the time when and the circumstances under which Prudential is liable' "—suggests only that benefits may be payable upon a different schedule than under the group policy. The plain language, referencing "circumstances," defeats SBE's construction.

SBE complains the summary does not spell out liability for claims between Prudential and the employer, and therefore Prudential must be regarded as insuring everything. To the contrary, the statement cited in paragraph (ii) spells out the separate liabilities. Moreover, SBE omits the following statement contained in the certificate of insurance attached to the plan summary given to employees: "The Group Policy has been modified

with respect to the coverages indicated above to take into account the Policyholder's establishment of a plan of benefits, herein called 'the Employer's Plan.' To the extent that the benefits under such coverages are afforded under the Employer's plan, *they are the liability of the Employer and not Prudential.*"[15] (Italics added.)

We thus conclude the summary, consistent with the MPP contract, apprises employees that Prudential is not liable for below-trigger-point claims.

SBE argues "everything" in the summary tells employees they have a "piece of the rock." Assuming the summary promises a "piece of the rock," that promise is fulfilled by Prudential's agreement to assume the obligation for claims over the trigger-point.

SBE maintains Prudential was required to advise employees that in the event of employer default, Prudential "will walk away with the employees' piece of that rock." SBE thus complains that although the summary tells employees that liabilities are split between the employer and Prudential, it does not tell the employee what will happen if the employer does not have funds to cover the annual maximum. SBE cites *Stahl* v. *Tony's Building Materials, Inc.* (9th Cir. 1989) 875 F.2d 1404. *Stahl* discussed the Employee Retirement Security Act (ERISA) (29 U.S.C. § 1022), which requires that employers give employees a plan summary explaining the circumstances which may result in loss of benefits.[16] In *Stahl*, the plan summary for a pension plan informed employees that cessation of employer contributions would result in the loss of past service credits. (875 F.2d at p. 1408.) The plaintiff/employee argued the description should have explained that employers are especially likely to fail to make contributions after expiration of a collective bargaining agreement, and that employees put their past service credits at risk by continuing to work at such times rather than retire. (*Id.* at p. 1407.) The Ninth Circuit disagreed, concluding that ERISA does not require plan summaries to discuss the application of general rules to particular situations. (*Id.* at p. 1408.) It is sufficient that the plan summary provide enough information from which the employee can infer the risk of loss of benefits. (*Ibid.*)

Here, we do not believe the plan summaries had to inform employees that they could be at risk in the event of employer default. That risk was readily

[15]Since we find no ambiguity, we need not address Prudential's assertion that certificate of insurance forms approved by the Insurance Commissioner are conclusively presumed to comply with the Insurance Code.

[16]The parties agree the plan summaries in this case were given to employees in order to comply with ERISA.

inferred from the plan summary's warning that Prudential assumed no liability for the separate obligations of the employer under the plan.

We conclude from the terms of the MPP contract and the plan summary that, unlike the arrangements at issue in *Metropolitan*, Prudential was not primarily or secondarily liable for below-trigger-point claims.

### 2. *No Automatic Reversion to Standard Policy*

■ Unlike the plan at issue in *Metropolitan*, which automatically terminated and reverted to conventional coverage upon employer default (32 Cal.3d at p. 657), the MPP contracts did not call for automatic reversion to conventional coverage in the event of employer default. As indicated, most of Prudential's MPP contracts were "post-discontinuance maximum" (PDM) contracts, which reset the trigger-point amount to divide liabilities during the run-off period (the posttermination period when claims incurred before termination continued to be submitted). In the event of termination of a PDM/MPP contract, Prudential had no obligation to provide conventional coverage and no obligation to pay benefits on any claims presented during the run-off period, unless the PDM was exceeded. Upon termination of non-PDM/MPP contracts (which account for 10 percent of the tax liability at issue), there was a limited and temporary reversion in the event of termination, in that Prudential assumed liability for the IBNR (incurred but not reported) claims for the run-off period only. We do not believe that this limited liability resulted in an inextricable intertwining of the obligations of Prudential with those of the employers.[17]

### 3. *Shift of Insurance Risk to Employer*

■ The third significant distinction between this case and *Metropolitan* is that here the employers assumed their own insurance risk, because the trigger-point was set by adding a margin to the actuarially expected level of claims. This differs from *Metropolitan*, where the trigger-point was set exactly at the actuarially expected level of claims.

As a preliminary matter, we address SBE's suggestion that employers cannot assume an insurance risk because they are not insurance companies.

---

[17]In a miscellaneous contention, SBE argues that the MPP contract was similar to a conventional policy because the premium for the MPP rider began with a standard policy premium, from which various amounts were deducted. This misses the point that the premium was reduced in exchange for the employer's assumption of obligations as an independent insurer. That the standard premium was the starting point for calculation of the MPP premium proves nothing either way.

In a somewhat muddled argument, SBE says the employers could perhaps be separate insurers if they were the insured, because they could then be self-insured, but since they were not the insured, they could not insure their employees because they are not insurance companies. The only authorities cited by SBE are cases addressing the question whether a particular entity was an insurer for purposes of being subject to statutes regulating insurers, e.g., the financial reserve requirements. (*People* ex rel. *Roddis* v. *California Mut. Assn.* (1968) 68 Cal.2d 677 [68 Cal.Rptr. 585, 441 P.2d 97]; *California Physicians' Service* v. *Garrison* (1946) 28 Cal.2d 790 [172 P.2d 4, 167 A.L.R. 306].) However, SBE cited these same cases in *Metropolitan* and received the Supreme Court's response that these cases, while generally helpful to an understanding of the nature of insurance, bore only tangentially on the issues presented. (*Metropolitan*, *supra*, 32 Cal.3d at p. 656.) As the Supreme Court explained, *Garrison* and *Roddis* dealt with insurance regulations designed to protect insureds, whereas protection of insureds is not the purpose of the taxing provisions. (*Metropolitan*, *supra*, 32 Cal.3d at p. 656.) We therefore reject SBE's reliance on *Garrison* and *Roddis*.[18]

SBE cites no authority prohibiting an employer from insuring its own employees' health care. Prudential cites *Title Ins. Co.* v. *State Bd. of Equalization* (1992) 4 Cal.4th 715 [14 Cal.Rptr.2d 822, 842 P.2d 121], which held arrangements by which underwritten title companies (not licensed to do insurance business) assumed a portion of title insurers' insurance risk were not illegal contracts of insurance. (*Id.* at p. 725.) The indemnity features of the contracts were secondary to the principal object of service. (*Id.* at pp. 726-727.) Here, SBE does not contend that the MPP arrangement would constitute an illegal contract of insurance.[19]

SBE contends no insurance risk was shifted to the employers, because the employers knew their liability was fixed by the annual trigger-point amount,

---

[18]We note the *Metropolitan* court went on to cite *Garrison* on the distinct question of agency, quoting its statement that an entity was not an insurer but "a mere agent or distributor of funds." (*Metropolitan*, *supra*, 32 Cal.3d at p. 657.) This has no bearing on SBE's contention that the employers could not be separate insurers because they are not insurance companies.

[19]Prudential also cites the *Title Ins. Co.* case for its holding that payments of title insurance claims made by the underwritten title companies (in discharge of their contractual obligation to indemnify the title insurers) were not "income" to the title insurers for purposes of calculating the title insurers' tax burden. (4 Cal.4th at pp. 728-729.) However, *Title Ins. Co.* dealt with distinct taxing provisions governing title insurance based on income. Moreover, the analysis in *Title Ins. Co.* was in terms of the underwritten title companies indemnifying the title insurers, not the persons who purchased title insurance. (*Id.* at pp. 725-726.) The court declined to address the government's belated contention that the portion of premiums received from customers and retained by the underwritten title companies were premiums constructively received by the title insurers for tax purposes. (*Id.* at pp. 729-733.) Thus, *Title Ins. Co.* is not directly applicable to the main issue in this case. Nevertheless, it supports the principle that where someone in addition to a licensed insurance company has an obligation to

just as their financial obligation would be fixed by a set premium due under a conventional policy. However, the cap on liability is immaterial to the question of whether an insurance risk was assumed. Insurers typically know their liability is fixed by policy limits. Contrary to SBE's contention, *Metropolitan* did not hold that a fixed limit means there is no insurance risk. Rather, there was no insurance risk in *Metropolitan* because the employer was committed to pay only the actuarially expected level of claims. Thus, the Supreme Court said: "[T]he employers had a fixed limit on the amount of funds they were obligated to make available in each month, *a limit corresponding to the expected level of claims. Metropolitan thus bore the substantial insurance risk [ ]—the risk that the actual level of claims for a given month might exceed the predicted level.*" (*Metropolitan, supra,* 32 Cal.3d at p. 658, italics added.)

Here, the employers did assume an insurance risk because they assumed the risk that claims would exceed the actuarially expected level of claims, and that they would have to pay those unknown claims within the agreed-upon margin. We note the plan involved in *Aetna, supra,* 11 Cal.App.4th 1207 similarly set the trigger-point by adding a margin (between 7 and 15 percent) to expected claims. The *Aetna* court said: "The setting of the liability limit at this high percentage results in the employer paying all claims in most years while providing insurance to the employer against extraordinary losses that may occur above the liability limit in an exceptional year. It was established at trial that the effect of setting the liability limit at the specified rate was that the employer paid approximately 99 percent of all benefits and Aetna approximately 1 percent." (*Aetna, supra,* 11 Cal.App.4th at p. 1210.) *Aetna* concluded that the employer bore the bulk of the insurance risk and was an independent insurer for claims below the liability limit. (*Id.* at pp. 1212-1213.)

Here, Prudential's witnesses testified that in the insurance industry in general, an "excess insurer" would typically expect to be called upon to pay claims no more than 5 to 10 percent of the time, and the relative amount of claims paid by an excess carrier would be expected to range from .5 to 1.5 percent of all claims. Prudential's actual experience with MPP contracts fell squarely within these ranges. The annual trigger-point amount was exceeded only 9.19 percent of the time and involved payment of only 1 percent of the claims dollars.

We disagree with SBE's contention, unsupported by authority, that the test for assumption of insurance risk is whether the employers indemnified

provide indemnity, the cost of such other "coverage" is not included in the measure of the insurance company's tax burden.

employees to a greater extent than would be the case under a standard insurance policy.

We conclude the MPP contracts shifted an insurance risk from Prudential to the employers. We note *Metropolitan* stated (in apparent dictum) that the "presence or absence of insurance risk on the part of the employers is not alone determinative of *Metropolitan*'s tax liability." (*Metropolitan, supra,* 32 Cal.3d at p. 656.) We therefore clarify that our ultimate conclusion that Prudential is entitled to a refund does not turn on this factor alone but on the totality of factors we have discussed.

Thus, three of the four factors cited in *Metropolitan* are not present in this case. We now turn to the sole common factor—the insurance company's administration of claims.

### 4. *Control Over Claims Administration*

■ SBE contends that an agency relationship was established by Prudential's control over administration of below-trigger-point claims. However, the mere existence of some agency relationship does not establish Prudential as the sole insurer. We disagree that control over claims administration, in and of itself, leads to the conclusion that the employers funded below-trigger-point claims as mere agents of Prudential rather than separate insurers.

SBE cites the various contract provisions giving Prudential the power or duty to process claims, make all claims determinations, and defend suits challenging denial of any claim. SBE also points to provisions requiring the employer to furnish Prudential with necessary information and directing employees to submit their claims directly to Prudential. SBE further notes the financial arrangements which gave Prudential access to employer funds for payment of below-trigger-point claims.

As SBE notes, *Metropolitan* indeed cited similar evidence of the insurance company's retention of control over plan administration—processing claims, defending and settling claims litigation. (*Metropolitan, supra,* 32 Cal.3d at p. 657.) SBE believes *Metropolitan* found agency based on these factors of control over administration. SBE also appears to assume that the existence of any aspect of agency relationship between Prudential and MPP contract holders will defeat Prudential's refund action. However, contrary to SBE's apparent belief, the Supreme Court did not hold that mere control over administration of claims by the insurance company leads to the conclusion that there is but one insurer. Instead, *Metropolitan*'s holding turned on the

inextricable intertwining of obligations between employers and insurance company, which demonstrated that the employers were not independent insurers.

Thus, Prudential's control over administration of claims is not sufficient in itself to support a conclusion that employers, in funding below-trigger-point claims, were mere agents of Prudential rather than separate insurers. As we have seen, insurance companies administer claims for self-insured employers under ASO contracts, and SBE agrees those employers are separate insurers. Indeed, SBE's entire argument on this point is inconsistent with its own concession that an insurance company's performance of administrative services under ASO contracts does not result in gross premiums tax liability. (See fn. 5, *ante*.)

SBE cites *Elfstrom* v. *New York Life Ins. Co.* (1967) 67 Cal.2d 503 [63 Cal.Rptr. 35, 432 P.2d 731], which held that an employer's bookkeeper acted as an agent of the insurer in performing the duties of administering the group life insurance policy. Thus, when the bookkeeper filled out an employee's application and certificate for insurance containing misstatements as to the employee's eligibility for coverage, the insurer was bound by the mistake of the employer's bookkeeper. (*Id.* at pp. 506, 512-513.) As expressed in *Elfstrom*, the agency relationship was shown by the insurer's control over the bookkeeper's performance of tasks relating to the insurance, i.e., the bookkeeper/agent performed functions under the insurer/principal's direction and for the principal's benefit. (*Elfstrom, supra*, 67 Cal.2d at pp. 510- 513.)

Thus, *Elfstrom* did not deal with the question presented in this appeal. We agree with Prudential that *Elfstrom* cannot be strained to mandate the imposition of tax liability every time a carrier administers an employer's benefit plan. Where, as here, the carrier assumes no liability, directly or indirectly, for the employer's payment of self-insurance benefits to its employees, the carrier's control over claims administration, without more, does not translate into insurance tax liability to the carrier.

We conclude the true economic substance of the MPP contracts was that the employers bore the bulk of the insurance risk, acting as independent insurers for all claims below the trigger-point, and that in assuming those obligations, the employers were not acting as mere agents of Prudential. We further conclude the obligations of Prudential and the employers under the MPP contracts were not inextricably intertwined so as to make Prudential the sole insurer under *Metropolitan*.

## IV.  *Other Contentions of SBE*

SBE contends the "primary question" to be resolved is whether the insured in this "tripartite arrangement" is the employer or the employee. We disagree.

We accept SBE's assertion that the employees are the insureds for all health care claims, whether below or above the trigger-point. However, the critical question under *Metropolitan* is who is the insurer for below-trigger-point claims—Prudential or the employer.

It appears SBE seeks to focus on the question of who is the insured because the measure of gross premiums insurance tax is the cost of the insurance to the insured, and *Metropolitan* determined that employer-paid claims were part of the employee's cost of group insurance coverage, for which employees paid with their labor. (*Metropolitan, supra*, 32 Cal.3d at pp. 660-661.) SBE asserts the evidence in this case showed that there was almost no difference in cost to employees between conventional policies and MPP contracts, because the premium for a conventional policy was close in amount to the MPP premium plus below-trigger-point claims paid by employers. However, without commenting on SBE's cost comparisons, it must be remembered that the Supreme Court engaged in this discussion of how to measure the tax on insurance for which Metropolitan "received" no "premiums" only after first concluding that Metropolitan was the sole insurer, with the employers acting as mere agents of Metropolitan.[20] (*Id.* at p. 659.) Here, the employee's contribution of labor, and the employer's payment of below-trigger-point claims, would be material to Prudential's tax liability only if Prudential was an insurer of below-trigger-point claims. We have concluded Prudential was not the insurer of below-trigger-point claims. Accordingly, the cost of below-trigger-point claims coverage to the employee (or the employer) is not material. Thus, SBE's extensive arguments about the meaning and measurement of "gross premiums" miss the mark.[21]

SBE also engages in extensive discussion of the history of the gross premiums tax, to support its argument that the gross premiums tax is

---

[20]SBE also believes "the employee has no insurance" under an ASO/stop-loss plan. It would appear, however, that those employees do indeed have insurance, with the employer in the role of insurer.

[21]SBE complains there was no evidence at trial that employees authorized their employer to divide their labor premium between the employer and Prudential. No such evidence was necessary in this case.

intended to cover all aspects of doing insurance business, including payment of claims. Again, however, this argument is beside the point, unless Prudential was the insurer as to below-trigger-point claims, with the employers acting as mere agents of Prudential when they funded below-trigger-point claims. Since we have concluded Prudential was not an insurer of below-trigger-point claims, we do not find SBE's discussion of the history of the gross premiums tax helpful.

SBE also argues the trial court erred by considering the fact that MPP contracts resulted in substantially reduced profits to Prudential as compared with conventional insurance policies. SBE contends this was error because the taxing provisions at issue in this case relate the tax to "gross premiums," not to "profits." Nevertheless, as *Metropolitan* explained, the gross premiums tax is "apparently designed to approximate the volume of business done in this state, and thus the extent to which insurers have availed themselves of the privilege of doing business in California." (32 Cal.3d at p. 656.) Indeed, the Supreme Court noted that "Metropolitan continued to derive substantially the same benefit of doing business in California and should logically have continued to incur the same tax liability." (*Id.* at p. 657.) Although Metropolitan lost the benefit of cash float, the court's conclusions regarding Metropolitan's tax liability turned on the finding that the employers were mere agents and Metropolitan was the sole insurer. We therefore conclude that the reduced profits resulting from the MPP contracts is not immaterial, though it is secondary to the question employers, in assuming the obligation for below-trigger-point claims, were acting as mere agents of Prudential or as separate insurers.

SBE points out there are distinctions between MPP contracts and nontaxable ASO/stop-loss arrangements. (See fn. 6, *ante.*) Thus, an ASO is not a contract of insurance, and the stop-loss is an insurance policy in which the employer, rather than the employee, is the insured. However, Prudential need not show the MPP contract was identical to the ASO/stop-loss arrangement in order to prevail.

V. *Conclusion*

Accordingly, we conclude the cost of claims paid by the employers under MPP contracts was not taxable as gross premiums received by and inuring to the benefit of Prudential. Therefore, the trial court properly found Prudential is entitled to a refund.

DISPOSITION

The judgment is affirmed.

Sparks, Acting P. J., and Raye, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 24, 1994. Mosk, J., was of the opinion that the petition should be granted.