[No. B071754. Second Dist., Div. Seven. Dec. 16, 1994.]

LINCOLN NATIONAL LIFE INSURANCE COMPANY, Plaintiff and Respondent, v.
STATE BOARD OF EQUALIZATION, Defendant and Appellant;
SOUTHERN CALIFORNIA GAS COMPANY., Intervener and Respondent.

1412

## Counsel

Daniel E. Lungren, Attorney General, Edmond B. Mamer and Herbert A. Levin, Deputy Attorneys General, for Defendant and Appellant.

Seyfarth, Shaw, Fairweather & Geraldson and Peter E. Romo, Jr., for Plaintiff and Respondent.

Christensen, White, Miller, Fink & Jacobs, Barry Fink and Eric N. Landau for Intervener and Respondent.

## Opinion

**JOHNSON, J.**—Plaintiff Lincoln National Life Insurance Company (LNL) filed suit against defendant State Board of Equalization of the State of California (Board) seeking a refund of gross premium taxes assessed and collected pursuant to article XIII, section 28, subdivision (c) of the California Constitution. Southern California Gas Company (SCG) was an intervener in the suit. The trial court found LNL only provided administrative services and ordered the Board to refund all premium taxes paid by LNL for the years 1980 through 1985 plus interest. The court also awarded costs to SCG as intervener. The Board appeals from the judgment. For the reasons explained below, we have determined the trial court correctly held LNL was entitled to a full refund of the contested taxes paid plus interest and costs. The trial court erred, however, in ordering an award of costs in favor of intervener SCG.

### Facts and Proceedings Below

This case arises out of an annual franchise tax, measured by the amount of gross premiums the insurer receives in a particular year, which is levied on insurers doing business in the state for the privilege of conducting an insurance business in the State of California.

LNL is an Indiana corporation doing business in California. Prior to July 1, 1980, SCG provided medical and dental benefits to its employees through conventional group medical insurance policies issued by LNL for which SCG paid LNL a premium. At that point, a traditional insurance relationship existed: in exchange for a premium, SCG transferred to LNL the risk and liabilities to pay eligible medical benefit claims.

Beginning July 1, 1980, SCG and LNL entered into a modification agreement concerning the group insurance policy. SCG decided to transform its employee benefit plan into a fully self-funded plan in order to eliminate the need for conventional insurance arrangements and the payment to an insurance company. SCG asked LNL to become the principal provider of administrative services to the new SCG self-funded plan. In return, SCG agreed to pay LNL a fee for providing such services. However, LNL, being an Indiana corporation, had to abide by Indiana law, which at that time provided an insurance company could only sell administrative services if they were related to a policy of insurance.

In order to provide SCG administrative services only, yet avoid violating Indiana law, LNL wrote an administrative agreement enclosed in the framework of an insurance policy. LNL then wrote a "Modification Agreement" which changed the essence and fundamental nature of the insurance policy to an agreement for administrative services only. The agreement specifically stated "[i]n no event shall LNL be liable for the benefits paid or payable by policy holder under the Plans nor shall policy holder be liable for the benefits paid or payable by LNL under the policy (for excess loss coverage) . . . ."

Under the new plan, employee health care claims were paid from SCG's funds up to a set liability limit or trigger point, beyond which LNL became liable for payment of claims. This trigger point was annually determined by actuarial prediction of the amount of expected claims by SCG's employees plus 25 percent (totaling 125 percent). SCG, not LNL, controlled the funds from which claims up to the trigger point were paid. When claims to employees were to be paid, SCG directed the transfer of funds from the trust administered by the Bank of America to a "Special Disbursement Bank Account" also owned by SCG. Funds remained under the dominion and control of SCG and were part of SCG's general cash accounts until such time as benefit checks were actually deposited by beneficiaries and cleared by banks. LNL had no control over such funds, and it derived no economic benefit or security interest benefit whatsoever from such funds. Furthermore, the modification agreement explained that in no event shall LNL be liable for the benefits paid or payable up to the trigger point.

The Board assessed LNL for taxes on claims paid by SCG under this plan, asserting they were taxable as gross premiums received by LNL under California Constitution, article XIII, section 28. LNL petitioned for a redetermination of the assessments which the Board denied.

After exhausting all possible administrative remedies, LNL and SCG instituted an action for a refund of all gross premium taxes collected from LNL for the years 1980 through 1985. LNL contended the assessment and collection of taxes on gross premiums was based upon a contract with SCG to provide administrative services to a self-funded medical and dental benefits plan and also a separate and minor amount of excess loss insurance. Accordingly, LNL argued the Board erred in assessing a gross premium tax on amounts paid by SCG as an employer out of its own funds for the benefit of its own employees pursuant to the self-funded plan. The Board contended the self-funded plan benefits paid by SCG to its employees were subject to the premium tax since LNL and not SCG was the one actually providing the insurance.

The Board moved for judgment on the pleadings against SCG. The trial court then realigned the parties by granting SCG leave to proceed as an intervener in this action, but not as a party plaintiff.

The trial court entered a judgment in favor of LNL and SCG and ordered the Board to refund to LNL all gross premium taxes collected from LNL for the years 1980 through 1985, totaling $3,158,909.69 plus interest. The trial court also awarded costs in favor of LNL in the amount of $563.10 and in favor of SCG in the amount of $14,332.04 as the prevailing parties. The Board appealed the trial court's judgment.

## DISCUSSION

*I. The Cost of Claims Paid by SCG Under the Modified Self-Insured Plan Is Not Taxable as Gross Premiums Received by and for the Benefit of LNL.*

■ The interpretation of a written instrument such as a contract is a question of law which we review de novo. Where the facts are not in dispute, the issue is one of law and the appellate court is therefore free to draw its own conclusions of law from the undisputed facts. (*McGowan* v. *City of San Diego* (1989) 208 Cal.App.3d 890, 894 [256 Cal.Rptr. 537]; *White* v. *Berrenda Mesa Water Dist.* (1970) 7 Cal.App.3d 894, 900 [87 Cal.Rptr. 338].)

Under article XIII, section 28[1] of the California Constitution, a franchise tax is imposed on each insurer doing business in this state which is measured by the amount of gross premiums received in a particular year. ▮ The insurer is to be assessed a tax based on the total cost of the insurance provided to the insured. (*Metropolitan Life Ins. Co.* v. *State Bd. of Equalization* (1982) 32 Cal.3d 649, 660 [186 Cal.Rptr. 578, 652 P.2d 426].) In other words, taxable gross premium is the cost of the insurance to the insured. (*Allstate Ins. Co.* v. *State Bd. of Equalization* (1959) 169 Cal.App.2d 165, 168 [336 P.2d 961].) ▮ The Board's principal claim is that LNL's taxable gross premiums included the amount transmitted from the trust account in California to the disbursement account in Indiana and paid from the latter account by the insurance company to SCG's employees in satisfaction of their claims under their group health insurance policy.

▮ Taxable gross premiums are measured by what the insured pays to the agent of the insurer, not by what reaches the insurer from its agents. (*Metropolitan Life Ins. Co.* v. *State Bd. of Equalization, supra,* 32 Cal.3d at pp. 652-662.) The Board relies on *Metropolitan* in which the California Supreme Court held that in employee group health insurance plans, taxable gross premiums included pre-trigger-point amounts paid by the employer into the control of the insurer and then by the insurer to the insured employees in satisfaction of their health insurance claims. (*Ibid.*) LNL and SCG do not argue with the applicability of this precedent, but claim the guiding principles and reasoning of the decision prohibit the Board from constitutionally assessing and collecting from LNL a premium tax based on the benefits paid by SCG to its employees under its new plan.

▮ In *Metropolitan,* the Supreme Court explained the purpose of the California tax on gross premiums is to "exact payments from insurers doing business in California." The gross premiums measure is designed to approximate the volume of business done in the state, and thus the extent to which insurers have availed themselves of the privilege of doing business in

---

[1]Article XIII, section 28 of the California Constitution provides:

"(a) [Insurer.] 'Insurer,' as used in this section, includes insurance companies or associations and reciprocal or interinsurance exchanges together with their corporate or other attorneys in fact considered as a single unit, and the State Compensation Insurance Fund. As used in this paragraph, 'companies' includes persons, partnerships, joint stock associations, companies and corporations.

"(b) [Basis.] An annual tax is hereby imposed on each insurer doing business in this state on the base, at the rates, and subject to the deductions from the tax hereinafter specified.

"(c) [Annual tax.] In the case of an insurer not transacting title insurance in this state, the 'basis of the annual tax' is, in respect to each year, the amount of gross premiums, less return premiums, received in such year by such insurer upon its business done in this state, other than premiums received for reinsurance and for ocean marine insurance."

California. (32 Cal.3d at p. 656.) The Supreme Court noted courts must look beyond the formal labels the parties have affixed to their transaction and seek to discern the true economic substance of the plan in question and consider the arrangement as a whole. (32 Cal.3d at pp. 656-657). In short, the Supreme Court set out to discover whether the insurance company actually was providing the primary level of insurance, as opposed to the employer. If the insurance company provides insurance at the primary level (i.e., if the employer funded below trigger-point claims as a mere agent of the insurance company), then the carrier should pay a gross premium tax. However, if the carrier only furnishes administrative services at the primary level and the employer was the insurer, then *Metropolitan* compels a contrary result. (*Prudential Ins. Co. of America* v. *State Bd. of Equalization* (1993) 21 Cal.App.4th 458, 473 [26 Cal.Rptr.2d 287].)

The Board claims that under employer-provided group health insurance plans, employers are the agents of the insurer as a matter of law. (*Metropolitan Life Ins. Co.* v. *State Bd. of Equalization, supra,* 32 Cal.3d at pp. 658-659.) However both *Aetna Life Ins. Co* v. *State Bd. of Equalization* (1992) 11 Cal.App.4th 1207 [15 Cal.Rptr.2d 26] and *Prudential Ins. Co. of America* v. *State Bd. of Equalization, supra,* recently decided the employers were the insurers and were not acting as agents for the insurance carriers. The mere existence of some agency relationship does not establish LNL as the sole insurer. "We disagree that control over claims administration, in and of itself, leads to the conclusion the employers funded below-trigger-point claims as mere agents of [LNL] rather than separate insurers." (*Prudential, supra,* 21 Cal.App.4th at p. 481.)

*Metropolitan* cited evidence of the insurance company's retention of control over plan administration-processing claims, defending and settling claims litigation. (*Metropolitan Life Ins. Co.* v. *State Bd. of Equalization, supra,* 32 Cal.3d. at p. 657.) The Board believes *Metropolitan* found agency based on these factors of control over administration. The Board also appears to assume the existence of any aspect of agency relationship between LNL and SCG will defeat LNL's refund action. "However, contrary to [the Board's] belief, the Supreme Court did not hold that mere control over administration of claims by the insurance company leads to the conclusion that there is but one insurer. Instead, *Metropolitan*'s holding turned on the inextricable intertwining of obligations between employers and insurance company, which demonstrated that the employers were not independent insurers.

"Thus, [LNL's] control over administration of claims is not sufficient in itself to support a conclusion that employers, in funding below trigger-point

claims, were mere agents of [LNL] rather than separate insurers. As we have seen, insurance companies administer claims for self-insured employers under [administrative services only] contracts." (*Prudential Ins. Co. of America* v. *State Bd. of Equalization, supra,* 21 Cal.App.4th at pp. 481-482.)

LNL argues several factors distinguish their plan from the one at issue in *Metropolitan* and lead to the conclusion that in paying below trigger-point claims the employer was not acting as a mere agent of LNL.

The Supreme Court in *Metropolitan* determined the obligations of the insurer were "inextricably intertwined" with those of the employers, and therefore, the employers were the agents of the insurance company. The finding of the "inextricably intertwined" relationship was based upon several factors: where the insurer was obligated to pay the claims if employers failed to do so, where there was reversion to standard coverage if employers failed to pay, where employers owed or paid conventional premiums, and where the employer had a fixed limit on the amount of funds that it was obligated to make available in each month resulting in the insurer bearing the substantial insurance risk under the arrangement (the risk that the actual level of claims for a given month might exceed the predicted level). (*Metropolitan Life Ins. Co.* v. *State Bd. of Equalization, supra,* 32 Cal.3d at pp. 657-658.) In *Metropolitan,* the court stated: "[G]iven this highly entangled, symbiotic relationship between the employers and Metropolitan, it is hard to accept Metropolitan's contention that in providing funds for payment of pretrigger-point claim, the employers were discharging their independent liabilities as separate insurers." (*Id.* at p. 658.)

The plan here, as a whole, does not include all the factors relied on in *Metropolitan* when determining the "inextricably intertwined" relationship between the insurer and employer.

As in *Metropolitan,* the agreement between SCG and LNL provided that if the employer did not fund the plan adequately to meet its obligation, LNL must pay claims owed by SCG who in turn "shall reimburse LNL for 105.58 percent of the claims paid by LNL." Here, however, SCG had to pay an additional percentage on top of the reimbursement to LNL. Furthermore, in their agreement LNL and SCG contracted in "no event shall LNL be liable for the benefits paid or payable by SCG under the Plan . . . ." In addition, unlike the plan in *Metropolitan,* if SCG failed to make the funds available, the plan would not automatically revert into the standard coverage. Furthermore, SCG did not pay conventional premiums for the services of LNL (since there was no automatic reversion provision).

As in *Metropolitan*, the SCG-LNL agreement imposed a fixed limit on the amount of funds the employer was obligated to make available in each month, but this level was significantly higher in the plan here than the one in *Metropolitan*. Here, the level was set at 125 percent of the actuarial predicted claims in a given year. Therefore, the risk for LNL was less and practically zero regarding its liability unless the trigger point was exceeded. As in *Aetna Life Ins. Co.* v. *State Bd. of Equalization, supra*, 11 Cal.App. 4th at page 1210, the insurance risk had been shifted to the employer because the trigger-point amount was set by adding a margin to the actuarial expected level of claims. Therefore the employers assumed their own insurance risk because they assumed the risk claims would exceed the actuarial expected level of claims, and that they would have to pay those unknown claims within the agreed-upon margin. (*Prudential Ins. Co.* v. *State Bd. of Equalization, supra*, 21 Cal.App.4th at p. 480.) This differs from *Metropolitan* where the trigger point was set exactly at the actuarial expected level of claims. Because all of the *Metropolitan* factors are not satisfied here, we conclude the obligations of the insurer and employer are not "inextricably intertwined."

Furthermore, the evidence supports the conclusion the employer and not the insurance company was the one actually providing the primary level of insurance. In order to analyze the true economic substance of the plan, we focus, as did the court in *Metropolitan*, on whether the insurance company assumed any actual risk at the primary (pre-trigger-point) level, whether the employer functioned as the agent of the insurance company, and whether the insurance company functioned as a provider of insurance or of administrative services at the primary level. (*Metropolitan Life Ins. Co.* v. *State Bd. of Equalization, supra*, 32 Cal.3d at pp. 649-667.)

As explained above, the insurance risk was shifted from LNL to SCG because of the high level of the trigger point which was set at 125 percent of the actuarial predicted claims. Consequently, LNL never assumed any liability for claims below the trigger point, and was only obligated to pay claims above the 125 percent trigger point. LNL received a premium from SCG for undertaking this excess loss insurance obligation, and paid taxes on these premiums (which are not the subject of this suit).

The Board contends an agency relationship was established by LNL's control over administration of pre-trigger-point claims. We disagree control over claims administration, in and of itself, leads to the conclusion the employer funded pre-trigger-point claims as mere agent of LNL rather than as a separate insurer. (*Prudential Ins. Co. of America* v. *State Bd. of Equalization, supra*, 21 Cal.App.4th at p. 481.) SCG controlled all of the funds to

pay the employee claims below the trigger point. Pursuant to the agreement, SCG was solely responsible for directing the transfer of its funds from the trust administered by the Bank of America to a special disbursement bank account also owned by SCG. LNL did not draw on the special disbursement account. The checks were written coded to the special distribution bank account and were cleared at that account. As the checks cleared, there was a request made to SCG as funds were needed to clear those claim checks. The funds remained under the complete control of SCG and were part of SCG's cash accounts until such time as the employee benefits were paid. LNL had no control over SCG's funds, and did not receive any benefits or profits from the above funds. The agreement specifically stated in part that "LNL is to act as our agent in making benefit payments for which we are liable . . . ." Therefore, SCG was not an agent for the insurer, but on the contrary, LNL was SCG's agent.

Finally, LNL merely rendered administrative services for a contracted fee. The only reason for the peculiarity of the contract in this situation was that at the time SCG decided to become self-funded and to limit its contract with LNL to administrative and excess loss services, there was an Indiana law prohibiting such an arrangement. Indiana statutory insurance accounting law at the time required LNL to report all its income as either investment income or premium income. There was no provision for the reporting of income received in return for the provision of administrative services. LNL is an Indiana corporation and is subject to Indiana insurance law.

Absent the problem raised by Indiana law, the superior court in its statement of decision explains "SCG could have taken two simple steps to implement the self-insurance plan. First, SCG could have negotiated a contract for the administration of the medical benefit plan by someone. Then, SCG could have separately purchased an excess loss insurance policy." It is the problem raised by Indiana's statutory insurance accounting requirements which created the situation resulting in this lawsuit. Therefore, looking at the contract and noticing the small fee paid to LNL illustrates that LNL was not being compensated for assuming any insurance risk, except for the excess loss coverage above the self-funded benefits.

Similar to *Aetna* and *Prudential*, we conclude the true economic substance of the plan here was that the employer bore the bulk of the insurance risk, acting as independent insurer for all claims below the trigger point, and that in assuming those obligations, the employer was not acting as mere agent of LNL. We further conclude the obligations of LNL and SCG under the plan here were not inextricably intertwined so as to make LNL the sole insurer

under *Metropolitan.* (*Prudential Ins. Co. of America* v. *State Bd. of Equalization, supra,* 21 Cal.App.4th at p. 482; *Aetna Life Ins. Co.* v. *State Bd. of Equalization, supra,* 11 Cal.App.4th at pp. 1212-1213.)

## II. *The Trial Court Did Not Abuse Its Discretion in Allowing SCG to Intervene, However, It Erred in Awarding Costs to SCG.*

### A. *The Decision to Permit SCG to Intervene Fell Well Within the Trial Court's Discretion and Did Not Interfere With the Procedures Established for Obtaining a Tax Refund.*

■ Pursuant to section 387[2] of the California Code of Civil Procedure, for permissive intervention, three factors must be established: "The intervenor must have a direct interest in the lawsuit, the intervenor must not enlarge the issues raised by the original parties, and the intervenor must not tread on the rights of the original parties to conduct their own lawsuit." (*People* ex rel. *Rominger* v. *County of Trinity* (1983) 147 Cal.App. 3d 655, 660-661 [195 Cal.Rptr. 186].)

The Board contends under California law only the party against whom a tax is assessed may challenge the tax. The Board assessed the taxes in question against LNL and not against SCG, and therefore LNL is the only party that may challenge the tax. Also, they claim the general legal standards applicable to one's presence as a party to a suit do not apply to a suit for tax refund.

Under the California Constitution, article XIII, section 32, "[a]fter payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, in such manner as may be provided by the

---

[2]Section 387, subdivision (a) of California Code of Civil Procedure provides:

"(a) Upon timely application, any person, who has an interest in the matter in litigation, or in the success of either of the parties, or an interest against both, may intervene in the action or proceeding. An intervention takes place when a third person is permitted to become a party to an action or proceeding between other persons, either by joining the plaintiff in claiming what is sought by the complaint, or by uniting with the defendant in resisting the claims of the plaintiff, or by demanding anything adversely to both the plaintiff and the defendant, and is made by complaint, setting forth the grounds upon which the intervention rests, filed by leave of the court and served upon the parties to the action or proceeding who have not appeared in the same manner as upon the commencement of an original action, and upon the attorneys of the parties who have appeared, or upon the party if he has appeared without an attorney, in the manner provided for service of summons or in the manner provided by Chapter 5 . . . Title 14 of Part 2. A party served with a complaint in intervention may within 30 days after service move, demur, or otherwise plead to the complaint in the same manner as to an original complaint."

Legislature." The Legislature has spoken regarding taxpayers' suits in the California Revenue and Taxation Code, sections 13101-13108 inclusive. Nowhere in these sections is intervention mentioned.

The Board interprets the provisions of the California Constitution combined with the Revenue and Taxation Code sections to mean the Legislature must expressly provide a means for intervention in a tax refund case, and because the code sections are silent on intervention, the Legislature did not intend to provide for such an action. However, courts have recognized California Code of Civil Procedure section 387[3] should be liberally construed in favor of intervention. (*Simpson Redwood Co. v. State of California* (1987) 196 Cal.App.3d 1192, 1200 [242 Cal.Rptr. 447].) Furthermore, as respondents explain, SCG filed a complaint in intervention seeking a tax refund for LNL and requested no other relief for itself. Therefore, the court, by granting the intervention, did not expand the methods for seeking tax refunds expressed in the Revenue and Taxation Code.

The trial court properly permitted SCG to intervene because the three factors set out in California Code of Civil Procedure section 387 were met. SCG had a direct pecuniary interest in the outcome of the action. Had LNL not prevailed, SCG may have been contractually obligated to reimburse LNL in an amount exceeding $3 million. In addition, in seeking an award in favor of LNL, SCG did not expand the scope of the original lawsuit beyond the four corners of LNL's complaint. As a result, the scope of discovery and trial was contained so that intervention would not and did not "tread on the rights of the original parties to conduct their own lawsuit."

In weighing these factors, the court is aware of the purpose behind intervention. That purpose is to promote fairness by involving all parties potentially affected by the judgment to participate in the litigation. Here, on balance, the application of the governing standards confirms SCG's status as an intervenor and does not constitute an abuse of discretion. In addition, nothing in the California Revenue and Taxation Code suggests the Legislature intended to prevent intervention by an appropriate party fulfilling the California Civil Procedure section 387 requirements. Therefore, SCG properly intervened in this action.

B.   *The Judgment in Favor of SCG for Costs Was Not Proper Under the California Revenue and Tax Code.*

■   The only remedy for recovering taxes asserted to have been incorrectly paid is to comply with the statutory provisions for obtaining a refund.

---

[3]See footnote 2, *ante.*

(*Willbarb Petroleum Carriers, Inc.* v. *Cory* (1989) 208 Cal.App.3d 269, 278 [256 Cal.Rptr. 5].) The manner provided by the Legislature for suits for refund of insurance gross premiums is set forth in Revenue and Taxation Code section 13108 which provides: "A judgment shall not be rendered in favor of the plaintiff when the action is brought by or in the name of an assignee of the insurer paying the tax, interest, or penalties, or by any person other than the insurer that has paid the tax, interest, or penalties."

The Board assessed the tax in question against LNL, not against SCG. Nevertheless, SCG intervened in the present suit for tax refund and obtained a judgment in its favor. Not only is such a remedy not provided by the Legislature, Revenue and Taxation Code section 13108 expressly prohibits "[a] judgment . . . in favor of the plaintiff when the action is brought . . . by any person other than the insurer that has paid the tax, interest, or penalties."

Revenue and Taxation Code section 13108 is very narrow and direct as to who may obtain a judgment in cases involving tax refunds. It expressly prohibits SCG from recovering a judgment in its favor in a tax refund case. Therefore, SCG, which was not the party against whom the tax was assessed or the insurer that actually paid the required taxes, is barred from winning a judgment herein, including a judgment for costs. As a result, the trial court's judgment awarding costs to SCG must be reversed.

### DISPOSITION

The judgment is affirmed as to LNL, and reversed as to SCG. LNL is entitled to its costs on appeal. All other parties are to bear their own costs.

Lillie, P. J., and Woods (Fred), J., concurred.