[No. A107090. First Dist., Div. Five. Aug. 15, 2005.]

IBM PERSONAL PENSION PLAN, Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and
Respondents.

CITY AND COUNTY OF SAN FRANCISCO, Plaintiff and Appellant, v.
ASSESSMENT APPEALS BOARD OF THE CITY AND COUNTY OF
SAN FRANCISCO, Defendant;
IBM PERSONAL PENSION PLAN, Real Party in Interest and Respondent.

COUNSEL

Fulbright & Jaworski, Robert W. Fischer, Jr., and Dinh Ha for Plaintiff and Appellant and for Real Party in Interest and Respondent IBM Personal Pension Plan.

Dennis J. Herrera, City Attorney, Wayne K. Snodgrass and Rafal Ofierski, Deputy City Attorneys, for Defendants and Respondents and for Plaintiff and Appellant City and County of San Francisco.

OPINION

**SIMONS, J.**—Revenue and Taxation Code[1] section 5140 provides that a real estate property tax refund action may be brought by the "person who paid the tax . . . . No other person may bring such an action; but if another should do so, judgment shall not be rendered for the plaintiff." In this matter, the IBM Personal Pension Plan (Plan) filed suit to recover property taxes and fraud penalties paid on its behalf by the Plan's trustee, The Chase Manhattan Bank, N.A. (Chase). Because we believe that the standing requirement in section 5140 means what it says, we conclude that the Plan, though the real party in interest, lacks standing to sue. Therefore we reverse that part of the judgment awarding the Plan in excess of $2.0 million and otherwise affirm.

FACTS[2]

The subject property, One Market Plaza, consists of a commercial office building parcel and a nearby parking garage parcel located in San Francisco. In 1973, the One Market Plaza Joint Venture (Joint Venture) was formed as a general partnership between The Equitable Life Assurance Society of the United States (Equitable), a New York corporation, and Southern Pacific Land Company (Southern Pacific), a California corporation. Subsequently, the Joint Venture built two large office towers on one parcel and a parking garage on a second parcel.

In 1985, the Plan, an employee benefit plan[3] established by International Business Machines Corporation (IBM) for the benefit of IBM's former

---

[1] All undesignated section references are to the Revenue and Taxation Code.

[2] In the trial court, the parties relied solely on the administrative record developed in the proceeding held before the Assessment Appeals Board for the City and County of San Francisco (AAB).

[3] The Plan is governed by the Employee Retirement Income Security Act of 1974 (ERISA). (29 U.S.C.A. § 1001 et seq.)

employees, asked its investment advisor, Equitable, to develop proposals for the Plan to invest in a portfolio of office buildings. At the time, the subject property was owned by the Joint Venture; Equitable held a 90 percent interest and the remainder was held by Southern Pacific. In December 1986, Equitable and the Plan[4] entered into a complex transaction characterized as a group annuity contract by which the Plan acquired 90 percent of Equitable's 90 percent interest in the Joint Venture (thus 81 percent of the whole) that was placed into "Separate Account 143," established and maintained by Equitable exclusively on behalf of the Plan. In exchange, the Plan deposited $185 million, representing 81 percent of the subject property's fair market value, into Separate Account 143. Such "separate accounts" are highly regulated transactions authorized by the insurance laws of California and New York, through which insurance companies sell annuities backed by assets placed into separate accounts, segregated from the insurance company's general assets and, therefore, beyond the reach of the company's general creditors. It is undisputed that the insurance laws of California and New York treat assets placed in the separate account of an insurance company as legally remaining the property of the insurer (here, Equitable), not the beneficiary (here, the Plan). (See Ins. Code, § 10506, subd. (a); N.Y. Ins. Law, § 4240, subd. (a)(12).)

■ The transfer of ownership of California real estate triggers a reassessment of the property under article XIII A of the California Constitution (Proposition 13) and a recalculation of the property taxes due. As a result of the 1986 transaction and subsequent transactions, Equitable retained legal title to the subject property and remained a general partner in the Joint Venture, but the transactions in substance transferred beneficial ownership to the Plan. Following the 1986 transaction, the Plan bore the risks and benefits of ownership of 81 percent of the property. Income from rents on the Plan's share of the property were paid to the Plan through the separate account. In addition, pursuant to the 1986 transaction, the Plan had the power to hire the day-to-day manager for the property and demand that Equitable transfer its remaining interest in the property to the Plan. As a result of subsequent transactions, Equitable held a nominal 99.5 percent interest in the Joint Venture, with 90 percent of that interest allocated to Separate Account 143 on the Plan's behalf. None of these transactions was ever reported to the Assessor for the City and County of San Francisco (Assessor).

In March 1990, Equitable and the Plan entered into a second group annuity contract and created "Separate Account 178," into which Equitable reallocated

---

[4] The other parties to the 1986 separate account transaction were Chase, as trustee for the Plan, and IBM.

all of its interest in the Joint Venture from Separate Account 143.[5] At this point, the subject property was still owned by the Joint Venture, which, itself, was 99.5 percent owned by Equitable on the Plan's behalf. Also in March 1990, Equitable notified its property insurer to terminate coverage of the subject property effective March 30, because as of that date Equitable would no longer have an ownership interest in the subject property.

In June 1990, the remaining 0.5 percent interest in the Joint Venture was sold by Equitable Variable Life Insurance Company, Equitable's wholly owned subsidiary, to the Plan's wholly owned subsidiary, One Market Plaza Corp. In November 1990, the Plan, identifying itself as the owner of the subject property, replaced Equitable's management company as the manager of the subject property with the Plan's own manager, The Yarmouth Group. Thereafter, Equitable had no management responsibility for the subject property.

In June 1993, the Plan terminated the second annuity contract and Special Account 178 in order to transfer the subject property to a third party purchaser, and directed Equitable to transfer the proceeds from the sale to the Plan. In 1994, the subject property was sold to the unrelated third party. In November 1994, IBM, Chase, as trustee for the Plan, and Equitable executed a release and indemnification agreement providing that upon completion of the sale of the subject property, the separate account and the Joint Venture were dissolved and the Plan was given all rights and liabilities arising from any reassessments and all rights to recover any overpayment of taxes and penalties. The Plan remained the sole remaining partner of the Joint Venture for purposes of the ensuing appeals before the AAB.

Following an investigation of the ownership of the subject property begun in or around January 1992, the Assessor concluded that the 1986 transaction constituted a change of ownership under the Revenue and Taxation Code.[6] In particular, the Assessor determined that the 1986 transaction represented a transfer of 81 percent of the beneficial ownership in the subject property from

---

[5] The other parties to the 1990 annuity transaction were Chase, as trustee for the Plan, and IBM. Like the 1986 transaction, Equitable sought ERISA exemptions from the United States Department of Labor, and the 1990 transaction was not reported to the Assessor.

[6] Section 60 defines a " 'change in ownership' " as "a transfer of a present interest in real property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest." Acquisition of more than a 50 percent interest in a joint venture results in a change in ownership of all property held by the joint venture. (§ 64; *Crow Winthrop Operating Partnership v. County of Orange* (1992) 10 Cal.App.4th 1848, 1856, fn. 6 [13 Cal.Rptr.2d 696].)

Equitable to the Plan in exchange for the Plan's payment to Equitable of 81 percent of the subject property's fair market value. The Assessor concluded that, as a result of the 1986 transaction, Equitable transferred to the Plan all rights of ownership, including the right to manage, receive rent from and sell the subject property.[7] Thereafter, the Assessor gave Equitable, as the owner of record of the subject property, notice that the property had been reassessed through a series of supplemental and escape assessments for the 1986 through 1994 tax roll years.

In November 1994, the Assessor notified Equitable that a 25 percent fraud penalty was being imposed pursuant to section 504 for the years 1987 through 1992 based on the failure to report the 1986 transaction as a change of ownership.[8] In 1995, following authorization by IBM, Chase wired approximately $18.4 million to the City and County of San Francisco (City) as payment of these fraud penalties.[9]

In 1995, Chase, as trustee for the Plan, filed an action in federal district court seeking a declaratory judgment that the Assessor's determination that the creation of the separate account constituted a change of ownership under California law was preempted by ERISA. (See *Chase Manhattan Bank, N.A. v. City and County of San Francisco* (9th Cir. 1997) 121 F.3d 557, 558.) After the district court dismissed the case, the Ninth Circuit upheld the district court's determination that the ERISA issue could be raised in state court. (*Id.* at p. 560.)

*AAB Proceedings*

The AAB received applications from Equitable and the Joint Venture for a reduction in and a refund of the penalty and nonpenalty assessments imposed for the tax years 1986 to 1987 through 1993 to 1994. The applications challenged three determinations by the Assessor: (1) the conclusion that a change of ownership of the subject property occurred in 1986; (2) the valuation of the subject property for the years 1986 to 1994 triggered by the change in ownership; and (3) the imposition of a fraud penalty for the tax years 1986 to 1992. In August 2001, following a hearing, the AAB issued its written findings of fact, conclusions of law, and decision, which upheld the

---

[7] Apparently the only right of ownership denied to The Plan was the right to record the deed.

[8] The Revenue and Taxation Code sections in effect at the time of the reassessment imposed fraud penalties of 25 percent of the additional assessed amount.

[9] At the hearing in the trial court, the Plan represented that these were the funds that it was seeking to recover in the instant refund action.

Assessor. Thereafter, the City and the Assessor notified the AAB that the "taxpayer" was due a partial refund as a result of the AAB's decision that the property should in part be valued at a lower rate than the Assessor originally used to calculate the escape and supplemental assessments.[10] On March 8, 2002, in response to requests by the parties, the AAB issued a clarification of its prior order stating that the Assessor could properly apply the fraud penalty only to the office complex parcel and could not apply the penalty to the off-site parking garage parcel. As a result, the subject property was entitled to an additional refund of approximately $2 million.

### The Instant Action

In February 2002, the Plan filed the instant verified complaint in San Francisco Superior Court against the City and the AAB, challenging the conclusion that the 1986 transaction constituted a change of ownership and seeking a refund of approximately $12 million plus interest imposed as a result of the reassessed valuation of the subject property, and almost $18.4 million in taxes and interest imposed as a fraud penalty. Alternatively, it sought a writ of administrative mandate compelling the AAB to conduct a new hearing on the grounds that the AAB abused its discretion by applying incorrect legal principles, considering evidence outside the administrative record and denying the Plan its right to due process. The complaint also sought a declaration that the fraud penalty assessment was preempted by ERISA. During the trial court proceedings, the Plan narrowed the relief sought to a full refund of the fraud penalties imposed, or in the alternative, to a partial refund of the fraud penalties imposed on the garage site based on the clarification order.

In May 2002, the Assessor filed a petition for writ of administrative mandamus (Code Civ. Proc., § 1094.5) against the AAB and the City seeking to set aside the March 2002 clarification order on the ground that the AAB lacked jurisdiction to modify the substance of its August 2001 decision. The actions of the Plan and the Assessor were consolidated.

The trial court upheld the AAB's tax fraud ruling, determining, among other issues, that the Plan had standing to bring its refund action[11] and that

---

[10] In April 2002, the City's controller wired approximately $12.6 million to Chase on behalf of the Plan "for settlement of [the] AAB [August 2001] decision."

[11] Alternatively, the court stated that the issue of the Plan's standing to claim a refund was moot in light of the court's determination that the Plan was not entitled to a refund of the fraud penalty payments. The court also noted that the fact that the City had already refunded the Plan $12.6 million impliedly acknowledged that the Plan is the real party in interest on whose behalf the taxes and penalties were paid.

the AAB had jurisdiction to issue its clarification order, eliminating the fraud penalty assessments for tax years 1986 to 1992 for the garage parcel of the subject property. Thereafter, a judgment of $2,053,510 plus interest issued in favor of the Plan as a refund of fraud penalties paid in regard to the garage parcel, but against the Plan on its claim for a refund of the other fraud penalties paid.

## DISCUSSION

The City and the AAB contend that the Plan lacked standing to bring the instant action for a refund of fraud penalties paid because it did not pay the challenged penalties. Standing is a question of law that we review de novo. (*McKee v. Orange Unified School Dist.* (2003) 110 Cal.App.4th 1310, 1316 [2 Cal.Rptr.3d 774].) In addition, the interpretation and application of constitutional and statutory provisions to stipulated and unstipulated facts present questions of law. (*Chen v. Franchise Tax Bd.* (1998) 75 Cal.App.4th 1110, 1114 [90 Cal.Rptr.2d 268].)

"The California Constitution expressly provides that actions for tax refunds must be brought in the manner prescribed by the Legislature. Article XIII, section 32, of the California Constitution [(hereafter article XIII, section 32)] provides in this regard: 'After payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, *in such manner as may be provided by the Legislature.*' . . . This constitutional limitation rests on the premise that strict legislative control over the manner in which tax refunds may be sought is necessary so that governmental entities may engage in fiscal planning based on expected tax revenues. [Citation.]" (*Woosley v. State of California* (1992) 3 Cal.4th 758, 789 [13 Cal.Rptr.2d 30, 838 P.2d 758].)

To implement article XIII, section 32, the Legislature enacted a specific statutory refund procedure for taxpayers whose property has been improperly assessed. (*Pacific Gas & Electric Co. v. State Bd. of Equalization* (1980) 27 Cal.3d 277, 284 [165 Cal.Rptr. 122, 611 P.2d 463]; §§ 5096 et seq., 5140 et seq.) Because article XIII, section 32 vests the Legislature with plenary control over the manner in which tax refunds may be obtained, a party "must show strict, rather than substantial, compliance with the administrative procedures established by the Legislature. [Citation.]" (*Neecke v. City of Mill Valley* (1995) 39 Cal.App.4th 946, 961 [46 Cal.Rptr.2d 266].)

Section 5096 provides for the "refund of taxes paid before or after delinquency if they were erroneously or illegally collected (subd. (b)), or illegally assessed or levied (subd. (c))." (*Hanjin Internat. Corp. v. Los Angeles County Metropolitan Transportation Authority* (2003) 110

Cal.App.4th 1109, 1112 [2 Cal.Rptr.3d 373].) Section 5097 requires that this refund be based on a claim that is "(1) Verified by the person who paid the tax, his or her guardian, executor, or administrator. [¶] (2) Filed within four years after making of the payment sought to be refunded . . . ."

If a refund claim filed pursuant to section 5097 is denied, section 5140 authorizes an action for refund of the taxes paid. Section 5140 provides: "The person who paid the tax, his or her guardian or conservator, the executor of his or her will, or the administrator of his or her estate may bring an action only in the superior court against a county or a city to recover a tax which the board of supervisors of the county or the city council of the city has refused to refund on a claim filed pursuant to Article 1 (commencing with Section 5096) of this chapter. No other person may bring such an action; but if another should do so, judgment shall not be rendered for the plaintiff."

### A. *Section 5140 Applies to Actions Seeking the Refund of Fraud Penalties*

We first address the Plan's contention that section 5140 "does not apply to an action for refund of fraud penalties, but only applies to an action for refund of taxes." In support of the contention, the Plan notes section 5140 refers to "taxes," not penalties. It also notes that article 1 (Refunds Generally) referred to in section 5140, is contained within chapter 5 (Refunds) of part 9 (Corrections, Cancellations, and Refunds) of the Property Taxation Division of the Revenue and Taxation Code, while sections 503 and 504 pertaining to fraud penalties are contained in article 3 (Arbitrary and Penal Assessments) of chapter 3 (Assessment Generally) of part 2 (Assessment) of the Property Taxation Division of the Revenue and Taxation Code. The Plan argues that because sections 503 and 504 are included within a different part of the property taxation division, section 5140 does not apply to actions seeking the refund of fraud penalties. We disagree.

■ "Article 1," referred to in section 5140, includes section 5107, which provides, "As used in this article [(Refunds Generally)], 'tax' or 'taxes' includes penalties, interest, and costs." Section 5107 is a general definitional section which defines the scope of tax refunds to include penalties and interest paid by a taxpayer in connection with tax payments. (*Ball v. County of Los Angeles* (1978) 82 Cal.App.3d 312, 318 [147 Cal.Rptr. 252].) It reflects the notion that a "penalty which is created by statute for failure to pay a tax assessment becomes part of the tax. [Citations.]" (*Sonleitner v. Superior Court* (1958) 158 Cal.App.2d 258, 263 [322 P.2d 496].)

In addition, the fraud penalties in sections 503 and 504 are considered "assessments" that are combined with escape assessments when the taxpayer's willful or fraudulent conduct or failure to report caused the property to escape assessment or be underassessed. (§§ 503, 504; 1 Ehrman & Flavin, Taxing Cal. Property (3d ed. 2004) §§ 14.08, 14.09, pp. 20–21.) The fraud penalty assessments are added to the assessed value of the particular real property and entered on the local assessment role. (Cal. Code Regs., tit. 18, § 261, subd. (a).) Finally, the Plan offers no statutory basis aside from section 5140 for an action seeking refund of sections 503 and 504 fraud penalties, and the Plan itself sought *both* tax refunds and fraud penalties paid in its "Complaint for Tax Refunds."[12] We reject the Plan's assertion that section 5140 does not apply to actions seeking refund of fraud penalties imposed under sections 503 and 504.

## B.   *The Plan Did Not Pay the Taxes and Penalties at Issue*

" 'The limitation contained in section 5140 simply means that only a person who has actually paid the tax may bring an action as opposed to the situation where someone else pays the property taxes of an owner of property.' [Citation.] [¶] . . . [S]ection 5140 does not affect the determination of what property is taxable and what property is exempt. It merely defines the procedure for refunding taxes improperly collected. The procedure provides for refund to the person who, or entity which, paid the tax if the property was exempt. This orderly approach prevents double refund of the taxes to the party who paid the tax and the party who owns the tax-exempt property. . . . [¶] . . . [S]ection 5140 is a mechanism for enforcing constitutional and statutory rights. Failure to follow the correct procedural rules can result in forfeiture of the power to enforce the constitutional right." (*Mayhew Tech Center, Phase II v. County of Sacramento* (1992) 4 Cal.App.4th 497, 510 [5 Cal.Rptr.2d 702].)

Revenue and Taxation Code section 5140 provides a statutory exception to the general rules governing the capacity to sue. (1 Schwing, Cal. Affirmative Defenses (2005 ed.) § 18:31, p. 987.) In such a case, a person expressly authorized by statute may sue without joining as parties the persons for whose benefit the action is prosecuted. (Code Civ. Proc., § 369,

---

[12] Without specifically commenting on the practice, California courts have entertained property tax refund actions brought to recover both property taxes and penalty assessments paid. (*Stenocord v. City etc. of San Francisco* (1970) 2 Cal.3d 984, 987–988 [88 Cal.Rptr. 166, 471 P.2d 966]; *L. B. Foster Co. v. County of Los Angeles* (1968) 265 Cal.App.2d 24 [71 Cal.Rptr. 16].)

subd. (a).)[13] Where as here, an action is entirely statutory and a particular statute specifies who may maintain an action, " '[i]t is . . . necessary . . . to bring the action in the name of the person to whom the right to sue is given by statute, regardless of any question as to the real party in interest.' " (*Black Rock etc. Dist. v. Summit etc. Co.* (1943) 56 Cal.App.2d 513, 517 [133 P.2d 58], quoting 20 Cal.Jur. (1925) Parties, p. 492.) This principle is reflected in Code of Civil Procedure section 367, which provides, "Every action must be prosecuted in the name of the real party in interest, *except as otherwise provided by statute*." (Italics added.) Thus, we reject the Plan's assertion that, as the real party in interest, it has a right to bring the instant refund action.[14]

The statutory limitation on standing in tax refund actions has existed since at least 1919. In *Easton v. County of Alameda* (1937) 9 Cal.2d 301, 303 [70 P.2d 640], our Supreme Court traced the evolution of this rule. In 1872, Political Code section 3804 (the predecessor statute to Rev. & Tax. Code, § 5140) was enacted providing, "Any taxes, per centum, and costs erroneously or illegally collected, may by order of the Board of Supervisors, be refunded by the County Treasurer." In 1889, Political Code section 3804 was amended to permit a refund "to the person entitled to the same." (Stats. 1889, ch. 236, § 1, p. 347.) In 1913, the section was again amended to restrict tax refunds "to the person paying the same or his guardian, or in case of his death, to his executor or administrator," and added the provision that "[i]n no case shall any judgment be rendered in favor of plaintiff in any action . . . brought by an assignee of the person paying said tax, or by any person other than the person who has paid said tax, [or his representative]." (Stats. 1913, ch. 145, § 1, p. 229.) Finally, in 1919, the section was amended to require a verified claim "by the person who has paid said tax." (Stats. 1919, ch. 274, § 1, p. 450.) *Easton* held that the statute "operates to benefit 'all persons who

---

[13] Code of Civil Procedure section 369 provides: "(a) The following persons may sue without joining as parties the persons for whose benefit the action is prosecuted: [¶] (1) A personal representative, as defined in subdivision (a) of Section 58 of the Probate Code. [¶] (2) A trustee of an express trust. [¶] (3) Except for a person upon whom a power of sale has been conferred pursuant to a deed of trust or mortgage, a person with whom, or in whose name, a contract is made for the benefit of another. [¶] (4) *Any other person expressly authorized by statute.* [¶] (b) Notwithstanding subdivision (a), a trustee upon whom a power of sale has been conferred pursuant to a deed of trust or mortgage may sue to exercise the trustee's powers and duties pursuant to Chapter 2 (commencing with Section 2920) of Title 14 of Part 4 of Division 3 of the Civil Code." (Italics added.)

[14] We reject any implied assertion by the Plan that the City's partial refund to the Plan establishes an estoppel. "[I]t is the unusual case in which estoppel will be applied in tax cases; the case must be clear and the injustice great . . . ." (*U. S. Fid. & Guar. Co. v. State Bd. of Equal.* (1956) 47 Cal.2d 384, 389 [303 P.2d 1034].) No such injustice has been demonstrated or even argued by the Plan.

pay taxes they are not legally bound to pay' [citation] but does not allow a recovery by a property owner whose taxes have been paid by someone else under a contract to do so. In that case the property owner has parted with nothing and he has no valid claim for a refund." (*Easton*, at pp. 303–304.)

Here, the administrative record shows that Chase, not the Plan, paid the tax and penalties. The Plan concedes this fact in its briefing. In early 1995, IBM authorized Chase to wire approximately $18.4 million from a particular "IBM Transfer Account" to the Bank of America for payment of the additional property taxes and penalty assessed on the subject property. The record does not reveal whether the "IBM Transfer Account" contained funds belonging to the Plan or IBM. A February 1996 letter from the City Controller stated the "amount of $18,361,130.88 of property taxes and penalties paid by [Chase]" was deposited in a City account. Finally, a December 1994 letter to the City Attorney from the attorney representing the Plan and IBM alerted the City that the Plan would be filing an action in federal court challenging the Assessor's findings, and stated in part, "Because [the Plan] is not the taxpayer, it cannot pursue appeals through the [AAB] and California courts in any event, and, for the sake of judicial economy, it is asserting all of its claims in the federal district court action."[15]

In reliance on *Mayhew*, the City and the AAB argue that since Chase paid the taxes and penalties, the Plan lacked standing to bring the instant refund action under section 5140. In *Mayhew*, the state and a general partnership entered into lease-purchase agreements under which the state leased property from the partnership. Pursuant to the agreement, if at the end of the lease term the state had made all rental payments, title to the property would vest in the state. The lease agreement also provided that the state would pay any taxes and assessments levied on the property. (*Mayhew Tech Center, Phase II v. County of Sacramento, supra,* 4 Cal.App.4th at pp. 501–502.) During the lease term, the general partnership transferred title to the property to a corporation, subject to the lease agreement. The County assessed property taxes on the property and the state, the partnership and the corporation brought actions against the county for refund of the property taxes paid for three fiscal years, on the ground that the state-owned property was exempt from taxation. (*Id.* at pp. 504, 507, 509.) The trial court found that the state paid the taxes for one of the three fiscal years at issue and allowed it to recover the property taxes for that year. However, it found that because the state did not pay the taxes for the other two years, it could not recover taxes for those years. (*Id.* at pp. 503–504.) On appeal the state contended it was improperly denied a refund for the two years it did not "directly" pay the taxes to the county because it had beneficial ownership of the property. (*Id.* at

---

[15] As we mentioned, *ante,* the action was filed in federal court by Chase, as trustee for the Plan.

p. 504.) The Court of Appeal concluded that the state had beneficial ownership of the property for tax purposes and its property was tax exempt. (*Id.* at pp. 505–507.) However, it rejected the state's refund argument, and held that because the state did not pay the taxes for two tax years it could not get a refund from the county through a refund action for those years. *Mayhew* noted that if the state reimbursed the partnership through increased rental payments for taxes the partnership paid, the state "should deal with" the partnership to retrieve those funds. (*Id.* at p. 510.)

The Plan argues that unlike *Mayhew*, there are no competing refund claims here, since the other potential claimants relinquished any claim to a refund by entering into the indemnity agreement. The Plan also argues that the City's payment of a $12.6 million refund to Chase for "Beneficiary [the Plan]" following the AAB's order is evidence that the Plan was the real party in interest as to the refund action. The Plan asserts that it would "exalt form over substance" to argue that the Plan lacked standing because the taxes and penalties were paid on the Plan's behalf.

■ We conclude that the plain language of section 5140 compels the conclusion that the Plan lacked standing to seek the refund of the taxes (including the penalty assessments) paid because it did not pay them. The statutory provisions could not be more clear: "No other person may bring such an action; but if another should do so, judgment shall not be rendered for the plaintiff." (§ 5140.)

Numerous other Revenue and Taxation Code sections regarding tax refund actions contain similar language, specifying that "judgment shall not be rendered in favor of the plaintiff" when the action is brought "by or in the name of an assignee" of the person who paid the tax or amount paid, "or by any person other than the person who paid" the tax or fee at issue. (See §§ 6937 [sales and use tax], 8152 [motor vehicle fuel license tax], 9175 [use fuel tax], 11577 [private railroad car tax], 13108 [insurance tax], 30407 [cigarette tax], 32418 [alcoholic beverage tax], 38617 [timber yield tax], 40131 [energy resources surcharge], 41114 [emergency telephone users surcharge], 43478 [hazardous substances tax], 45708 [integrated waste management fee], 46528 [oil spill response, prevention and administration fees], 50149 [underground storage tank maintenance fee], 55248 [feepayer], 60548 [diesel fuel tax].)

In *Lincoln National Life Ins. Co. v. State Bd. of Equalization* (1994) 30 Cal.App.4th 1411, 1423–1424 [36 Cal.Rptr.2d 397], the Court of Appeal reversed a judgment in favor of the plaintiff who filed an insurance tax refund action pursuant to section 13108 because the plaintiff was neither the party

against whom the tax was assessed, nor the insurer that actually paid the required taxes, and was therefore statutorily barred from obtaining a judgment.

The reason these tax statutes impose such a restrictive standing requirement is evident. This limitation frees the taxing authority from the burden, often far greater than in the instant case, of untangling a web of agreements and/or accounts in order to ascertain who is the proper recipient of any refund due. This determination is, of course, critical to avoiding a double payment. (See, e.g., *Azadozy v. Nikoghosian* (2005) 128 Cal.App.4th 1369, 1373–1374 [27 Cal.Rptr.3d 811] [§ 4675, which provides that only a person "with title of record" is entitled to receive the "excess proceeds" from the tax sale of property, is strictly construed because it provides an "administratively convenient" method to determine the proper recipient]; cf. *Mayhew Tech Center, Phase II v. County of Sacramento, supra,* 4 Cal.App.4th at p. 510.) Even here, when the plaintiff presents an agreement from the party who paid the tax, the standing limitation insulates the taxing authority from the risk of inaccurately determining the agreement's validity.[16]

The record before us does not establish that the Plan paid the taxes challenged; it does not reflect that the money Chase wired in payment of the subject taxes was authorized by the Plan, or wired from the Plan's funds. Neither the existence of the indemnity agreement nor the fact that the Plan may be the real party in interest in the instant action permits a person or entity other than one expressly authorized in section 5140 to bring a tax refund action. Although the Plan may be the real party in interest as to the taxes and penalties paid by Chase, the Plan's failure to pay the taxes barred it from bringing this refund action. The judgment in favor of the Plan is reversed.[17]

---

[16] In certain unique circumstances, in sales tax cases, the California Supreme Court has carved out an equitable exception to this limited standing rule. If the retailer has overpaid a sales tax and overcharged the consumer, the limited standing rule, if strictly interpreted, would preclude the consumer from suing the taxing authority for a refund. Since the retailer has little economic incentive to pursue a refund that it would be obliged to turn over to the consumer, an injustice can result. In *Javor v. State Board of Equalization* (1974) 12 Cal.3d 790 [117 Cal.Rptr. 305, 527 P.2d 1153] and *Decorative Carpets, Inc. v. State Board of Equalization* (1962) 58 Cal.2d 252 [23 Cal.Rptr. 589, 373 P.2d 637] the California Supreme Court ruled that where the consumer sues both the retailer-taxpayer and the State Board of Equalization, the court can fashion a remedy that requires the retailer to seek a refund and the board to deposit the money with the court for payment to the consumer. In our case, the Plan has not briefed these cases and it did not name the taxpayer (Chase) as a party in this suit. Moreover, the record does not reflect any unwillingness on the part of the taxpayer to pursue a refund; Chase, in fact, filed the initial lawsuit in federal court seeking declaratory relief.

[17] In light of our determination that the Plan lacked standing to bring the instant action, we need not address the Plan's claims of error.

## DISPOSITION

The judgment awarding the Plan a partial refund of fraud penalties paid is reversed. The judgment in favor of the City on the Plan's claim for refund of fraud penalties is affirmed. The City is entitled to its costs on appeal.

Jones, P. J., and Stevens, J., concurred.